IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **EMILY DAVIS,** ) | CIVIL ACTION NO. 10-782 |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| ) | |
| v. ) | |
| ) | |
| **PITTSBURGH PUBLIC SCHOOLS,** ) | |
| **PITTSBURGH FEDERATION OF** ) | |
| **TEACHERS,** ) | |
| ) | |
| Defendants, ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

### I. *Introduction*

Pending before the court is a motion for summary judgment (ECF No. 41) filed by defendant Pittsburgh Public Schools ("PPS" or the "district") and a motion for summary judgment (ECF No. 44) filed by defendant Pittsburgh Federation of Teachers ("PFT" or collectively with PPS, "defendants"). Plaintiff Emily Davis ("Davis" or "plaintiff") initiated this action on June 8, 2010 by filing a four-count complaint alleging: (1) race and gender discrimination under Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e et seq. ("Title VII") against PPS (count one); (2) age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA") against PPS and PFT (count two); (3) race and gender discrimination under 42 U.S.C. §§ 1981 and 1983 against PPS and PFT (count three); and (4) age, race, and gender discrimination under the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. § 951 et seq. ("PHRA") against PPS and PFT (count four). (ECF No.

1.) On September 2, 2010, PPS filed an answer to the complaint. (ECF No. 9.) On September 3, 2010, PFT filed an answer to the complaint. (ECF No. 10.)

On March 20, 2012, after engaging in discovery, PPS and PFT each filed a motion for summary judgment and a brief in support of that motion (ECF Nos. 41, 44, 45, 46.) PPS and PFT filed a joint concise statement of material facts and appendix thereto on the same day (ECF Nos. 42, 43.) On May 9, 2012, plaintiff filed a brief in opposition to each of defendants' motions for summary judgment. (ECF Nos. 52, 53.) Plaintiff filed a response to defendants' joint concise statement of material facts on the same day. (ECF No. 51.) On June 1, 2012, PFT filed a reply brief to plaintiff's brief in opposition. (ECF No. 58.) On June 4, 2012, PPS filed a response to plaintiff's response to defendants' joint concise statement of material facts. (ECF No. 60.) PPS filed a reply brief to plaintiff's response in opposition on the same day. (ECF No. 61.) On June 5, 2012, the parties filed their combined statement of material facts. (ECF No. 62.)

After an extensive consideration of the parties' submissions and the applicable legal principles, the court concludes that in light of the summary judgment standard of review and based upon the evidence of record, plaintiff cannot prove that a similarly situated employee received more favorable treatment with respect to the elimination of her position as teacher on special assignment or that PPS' reason for her furlough, i.e., compliance with state certification requirements, was pretext for discrimination under state or federal law. The motions for summary judgment filed by PPS and PFT against plaintiff will be GRANTED.

## II. Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. <u>See</u>

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## **General Background**

Plaintiff is an African-American female and was sixty-five years old when the events at issue in this case occurred. (ECF No. 1 ¶¶ 27, 31.) Plaintiff was employed by PPS from 1988 until she was laid off in August 2008. (Combined Statement of Material Facts ("C.S.F.") (ECF No. 62) ¶ 7; Deposition of Plaintiff ("Pl.'s Dep.") (ECF No. 43-2) at 8-9.) Davis has not worked since her furlough from PPS in August 2008 and has not applied for any jobs or positions since her furlough. (Pl.'s Dep. (ECF No. 43-2) at 9-10.) On April 4, 2009, Davis signed an Application for Retirement with the Public School Employees' Retirement Systems, with an effective retirement date of June 30, 2009. (Pl.'s Dep. (ECF No. 43-2) at 10-12; ECF No. 43-3 at 2-11.) PPS is a governmental entity which provides free public education to students in the Pittsburgh area. (C.S.F. (ECF No. 62) ¶ 10; ECF No. 1 ¶ 4.) PFT is a labor organization representing teachers and other professional employees who are subject to the collective bargaining agreement between PPS and PFT, Local 400, American Federation of Teachers, AFL-CIO. (C.S.F. (ECF No. 62) ¶ 11; ECF No. 43-1 at 2-10; ECF No. 1 ¶ 5.)

Between 1988 and June 2008, plaintiff worked primarily as a teacher on special assignment and in other positions connected to the central office of PPS. (C.S.F. (ECF No. 62) ¶ 9; Pl.'s Dep. (ECF No. 43-2) at 19-26; ECF No. 43-3 at 19.) Plaintiff last worked for PPS as a staff specialist with respect to business programs for the Career & Technical Education ("CTE") department in the CTE central office. (C.S.F. (ECF No. 62) ¶ 8; Pl.'s Dep. (ECF No. 43-2) at 43-44; Deposition of Marlene Harris, Aug. 9, 2011 ("Harris' Dep. I") (ECF No. 43-4) at 31.) That position was eliminated at the end of the 2007-2008 school year. (<u>Id.</u>)

Cherri Banks ("Banks"), William Cook, Jr. ("W. Cook"), and Eunice Anderson ("Anderson") worked in the CTE central office with plaintiff. (Deposition of Cherri Banks ("Banks' Dep.") (ECF No. 43-8) at 8.)

Banks served as a staff specialist with respect to family consumer sciences during the same time plaintiff served as a staff specialist for business programs. (Banks' Dep. (ECF No. 43-8) at 9.)

Banks, who was born in 1952, is an African-American female. (Declaration of Susan Dobies-Sinicki ("Dobies-Sinicki's Decl.") (ECF No. 43-6) ¶ 7.) Banks retired in June 2010. (C.S.F. (ECF No. 62) ¶ 24; Banks' Dep. (ECF No. 43-8) at 4, 6.) The last position she held in the CTE central office was as a curriculum coordinator. (C.S.F. (ECF No. 62) ¶ 26; Banks Dep. (ECF No. 43-8) at 4, 8.) W. Cook served as a staff specialist with respect to trade and industry from July 1, 2001 until he transferred to the CTE supervisor position effective August 28, 2008. (C.S.F. (ECF No. 62) ¶ 30; Dobies-Sinicki's Decl. (ECF No. 43-6) ¶ 9.) W. Cook was born in 1951 and is a white male. (Dobies-Sinicki's Decl. (ECF No. 43-6) ¶ 8.) W. Cook retired on April 4, 2011. (Id.) As staff specialists, plaintiff, Banks, and W. Cook had the same job description. (Pl.'s Dep. (ECF No. 43-2) at 44-45.) Plaintiff, Banks, and W. Cook created their job descriptions in 2006. (Id.)

Anderson served as the director of CTE during the time period at issue in this case until her retirement. (C.S.F. (ECF No. 62) ¶ 27; Banks' Dep. (ECF No. 43-8) at 4, 8.) Anderson, who was born in 1947, is an African-American female. (Dobies-Sinicki's Decl. (ECF No. 43-6) ¶ 6.)

Dr. Julia Stewart ("Stewart"), who was born in 1943, is a white female. (Id. at ¶ 4.) Stewart was employed by PPS as the executive director of CTE for approximately two and one-half years, from 2007-2009. (C.S.F. (ECF No. 62) ¶¶ 12, 13; Dobies-Sinicki's Decl. (ECF No.

43-6) ¶ 4; Deposition of Julia Stewart ("Stewart's Dep.") (ECF No. 43-5) at 5; Harris' Dep. I (ECF No. 43-4) at 29.) Davis testified that the longest conversation she had with Stewart was when Stewart first became executive director of CTE and they went to lunch, at which time the subject of age came up and Davis learned that Stewart and she were only a few months apart in age. (Pl.'s Dep. (ECF No. 43-2) at 47-48.) Plaintiff testified that upon learning they were close in age, Stewart asked her if she had plans on retiring soon. (Id. at 47.) Plaintiff testified that she told Stewart she did not have plans on retiring soon because she needed to work a longer period of time. (Id.)

Prior to her employment with PPS, Stewart was employed by the McKeesport Area School District for twenty-seven years, most recently as its director of CTE. (C.S.F. (ECF No. 62) ¶ 14; Stewart's Dep. (ECF No. 43-5) at 5.) In 2007, Stewart was contacted by PPS to assist the CTE department of PPS with respect to the upcoming Pennsylvania Department of Education ("PDE") chapter 339 audit (a "339 audit"). (C.S.F. (ECF No. 62) ¶ 15; Stewart's Dep. (ECF No. 43-5) at 5-8.)

Chapter 339 contains CTE policies with respect to how a CTE program should operate in high schools and CTE centers in Pennsylvania. (Banks' Dep. (ECF No. 43-8) at 9.) A 339 audit is an audit of a district's CTE department and programs. (Stewart's Dep. (ECF No. 43-5) at 10-11.) A 339 audit concerns certification issues, i.e., whether CTE employees were certified to do the jobs they were doing, and CTE program content, i.e., whether the district's programs were in compliance with PDE standards. (Id. at 29.) When Stewart began working for PPS, she directed her attention toward the CTE department's compliance with chapter 339. (C.S.F. (ECF No. 62) ¶ 47; Stewart's Dep. (ECF No. 43-5) at 8-9.)

The PDE issues Certification Staffing Policies ("CSPGs") to determine the validity of teacher certification in academic areas. (Deposition of Karen Turner ("Turner's Dep.") (ECF No. 43-14) at 7-10.) CSPGs are policy documents issued by the PDE that describe the scope of each certificate, meaning the courses that may be taught by a person holding that particular certification. (Id. at 10.) One CSPG may cover various certifications issued in different years with respect to the same area of coverage. Certifications issued in different years may have different scopes of coverage. (Id. at 16-17.)

The PDE also issues codes for Classification of Instruction Programs ("CIPs") that correspond with specific approved programs taught in the schools. (Id. at 7-10.) A CIP code is a document containing information about specific courses offered by a CTE program. (ECF No. 51-3 at 25-37.) The document contains, among other things, the title of the course, a numerical identifier for the course, a description of the course, and the certifications required to teach that course. (Id.)

A certification with respect to CTE is different from certifications in academic fields. (Turner's Dep. (ECF No. 43-14) at 6-7.) A CTE certification is an instructional certificate that may be used in both academic and vocational areas. (Id. at 7.) For example, CTE certificates in family consumer science, co-operative education, and marketing and distributive education are instructional certificates that apply in both academic and vocational areas. (Harris' Dep. I (ECF No. 43-4) at 64.) In order to be certified in a vocational program, an individual must have a specific amount of work experience in a specified area of study, must attend a college program, pass certain tests, and pass an occupational competency test by either a committee review or an on-site test. (Turner's Dep. (ECF No. 43-14) at 9; Harris' Dep. I (ECF No. 43-4) at 63-64.) In certain circumstances, if a teacher possesses certain prerequisites, he or she may obtain

additional certifications by taking a test. (Deposition of Sylvia Wilson ("Wilson's Dep.") (ECF No. 43-7) at 35.)

Schools receive specialized federal funding for CTE programming. (Stewart's Dep. (ECF No. 43-5) at 7.) Schools annually receive around five hundred dollars per student enrolled in a CTE program offered at that school. (Id.) The funding for CTE is connected to the teachers and their certifications. (C.S.F. (ECF No. 62) ¶ 51; Stewart's Dep. (ECF No. 43-5) at 25-26; Harris' Dep. I (ECF No. 43-4) at 53-54.) A report is sent from the school district to PDE once a year with respect to each course, including the name and certifications of the teacher of that course and the number of students enrolled in that course. (Stewart's Dep. (ECF No. 43-5) at 25-26.) A teacher cannot teach a course he or she is not certified to teach unless an emergency permit is issued. (C.S.F. (ECF No. 62) ¶ 51; Stewart's Dep. (ECF No. 43-5) at 25-26; Harris' Dep. I (ECF No. 43-4) at 53-54.)

"An Emergency Permit is requested when a public school entity needs to hire an educator, but is unable to locate a fully qualified individual that holds a valid and active teaching certificate in the appropriate subject area." (ECF No. 60-8 at 1; Harris' Dep. I (ECF No. 43-4) at 53-54.) In those circumstances, the school district must apply for an emergency permit from the PDE to permit an employee currently enrolled in a program to acquire the necessary certification to hold that position although he or she has not met the qualifications necessary for certification by the PDE. (Id.) "In the case of a permanent opening (vacant position), the school entity must continue to make every effort to fill the vacancy with a fully qualified and properly certified professional employee" subject to two limited exceptions: (1) "when the position is slated to be collapsed;" or (2) "when the vacancy occurs during the last half of the second semester." (ECF No. 60-8 at 1.) In order to apply for an emergency permit for a vocational instructional area,

> [t]he school entity is required to post any vacant or long-term substitute positions for a minimum of 10 days on the school entity's website. If no qualified candidate has been identified, an Emergency Permit application can be submitted.

(ECF No. 60-8 at 6.) An emergency permit is issued for as long as it takes an individual to meet the requirements for certification; provided, he or she is taking classes equal to nine credits a year toward that certification. (Harris' Dep. I (ECF No. 43-4) at 73.)

### CTE Staffing Certification Issues – Fall 2007

When Stewart began her job with PPS, her first concern was that members of the district's CTE department staff were not properly certified according to PDE's standards. (Stewart's Dep. (ECF No. 43-5) at 9.) In August 2007, PPS received a memorandum from PDE clarifying the requirements needed for supervising vocational education programs (the "PDE memorandum"). (ECF No. 51-14 at 14.) The PDE memorandum provided that a vocational supervisory certificate or vocational director certificate is required when fifty percent or more of an assignment is related to supervising vocational education programs. (Id.)

In the fall of 2007, Stewart received a letter from PDE advising that it would be conducting a 339 audit of PPS. (C.S.F. (ECF No. 62) ¶ 49; Stewart's Dep. (ECF No. 43-5) at 9.) The 339 audit occurred in October, November, and December 2008. (Stewart's Dep. (ECF No. 43-5) at 28-29.) In response to that notification, Stewart had a list developed of CTE central office staff and CTE teachers and their respective certifications and what the certifications permitted them to do or teach. (C.S.F. (ECF No. 62) ¶ 50; Stewart's Dep. (ECF No. 43-5) at 11.) Stewart determined who was and was not certified with respect to the positions each person held. (C.S.F. (ECF No. 62) ¶ 51; Stewart's Dep. (ECF No. 43-5) at 11, 12, 32.)

Stewart learned that none of the PPS employees working in the CTE central office had a vocational supervisory certificate or vocational director certificate, meaning they were not

certified according to PDE standards to hold supervisory positions within the CTE department. (Stewart's Dep. (ECF No. 43-5) at 9; ECF No. 51-14 at 14.) The following bullets identify the certifications that were held.

- Plaintiff had an instructional II certificate in distributive education; an instructional II certificate in cooperative education 7-12; and an educational specialist I certificate in secondary school guidance. (C.S.F. (ECF No. 62) ¶ 10; Pl.'s Dep. (ECF No. 43-2) at 30; ECF No. 51-1 at 17, 42.) Plaintiff obtained her distributive education and cooperative education certifications in 1991, and they are valid for ninety-nine years. Plaintiff obtained her secondary school guidance certificate in 1979, and it was valid for three years. (Pl.'s Dep. (ECF No. 43-2) at 30; ECF No. 43-3 at 20.)

- Anderson had an assistant superintendent letter of eligibility; and certifications in secondary principal; distribution education, and cooperative education. (ECF No. 51-1 at 17.)

- W. Cook had a superintendent letter of eligibility and certifications in secondary principal, general electricity, and social studies. (Id.)

- Banks had superintendent and assistant superintendent letters of eligibility; an instructional II certificate in home economics; and an administrative II certificate in secondary principal. (Id. at 17, 40; Banks' Dep. (ECF No. 43-8) at 7.)

After receiving the PDE memorandum and letter from PDE, Stewart informed the human resources department about the various individuals on the list who were in positions they were not certified to hold. (C.S.F. (ECF No. 62) ¶ 52; Stewart's Dep. (ECF No. 43-5) at 11, 12, 32.) Stewart worked with Marlene Harris ("Harris"), the manager of recruiting and staffing for PPS, and Frank Chester ("Chester"), the chief of human resources for PPS, to resolve the issues raised by the certification discrepancies. (Stewart's Dep. (ECF No. 43-5) at 12; Harris' Dep. I (ECF No. 43-4) at 32.)

Harris, who was born in 1957, is an African-American female. (Dobies-Sinicki's Decl. (ECF No. 43-6) ¶ 5.) She was responsible for the hiring of all the professional staff for PPS,

placing the staff into open vacancies as part of the transfer process, new hiring, hiring individuals into open positions, resignations, and furloughs. (Harris' Dep. I (ECF No. 43-4) at 17.) It was Harris' job to understand PDE certification requirements. (Id. at 21.)

Chester sent plaintiff, Banks, W. Cook, and Anderson each a letter dated October 19, 2007 (the "letter") advising them that the PDE memorandum "clarif[ied] the requirements needed for supervising vocational education programs." (ECF No. 51-1 at 14; Banks' Dep. (ECF No. 43-8) at 15-16; ECF No. 43-5 at 49.) The letter provided:

> A vocational supervisory certificate or vocational director certificate is mandated when 50% or more of an assignment is related to supervising vocational education programs. To this end, it will be necessary for you to secure the Vocational Supervisory or Vocational Director certificate in order to remain in your present position.

(Pl.'s Dep. (ECF No. 43-2) at 55-57; ECF No. 43-3 at 23, 24-25; ECF No. 43-5 at 48, 49; ECF No. 51-1 at 14.) The letter also advised its recipients to contact Don Gamble ("D. Gamble"), Director of Vocational Education at Indiana University of Pennsylvania ("IUP"),[1] "to review [their] credentials and discuss the requirements necessary to obtain this additional certification," and to contact Harris by November 1, 2007 with information concerning the recipients' plans with respect to obtaining the certification. (Pl.'s Dep. (ECF No. 43-2) at 187-88; ECF No. 43-3 at 23; Harris' Dep. I (ECF No. 43-4) at 68-70.) The PDE memorandum was attached to the letter and provided that chapter 339.41(5) "clearly mandates the requirement of a Vocational Supervisory or Vocational Director Certificate if 50% or more of an educator's assignment is related to supervising vocation education programs." (ECF No. 43-3 at 24-25.)

---

[1] Stewart testified that IUP is the "university in this part of Pennsylvania where people must take classes in order to get career and technical certifications." (Stewart's Dep. (ECF No. 43-5) at 13.) Harris testified that IUP is the only school locally that has the vocational director program. (Harris' Dep. I (ECF No. 43-4) at 72.)

Plaintiff, Banks, and W. Cook each supervised different programs as staff specialists in the CTE department. Plaintiff supervised business programs; Banks supervised family consumer sciences; and W. Cook supervised trade and industry. (Banks' Dep. (ECF No. 43-8) at 8-9.) Banks spent 60% of her time supervising CTE teachers and staff. (Id. at 14-15.) Plaintiff's job responsibilities included monitoring teachers in the classroom, curriculum writing, textbook adoption, handling budgets, ordering supplies and materials, visiting teachers in schools, helping to write reform plans, and developing programs and student partnerships with universities and businesses. (Pl.'s Dep. (ECF No. 43-2) at 43-44.) Plaintiff asserts that in her role as a staff specialist, she spent less than 50% of her time acting in a supervisory capacity. (Id. at 56-57.)

Stewart testified that plaintiff was a supervisor requiring either the vocational supervisory or vocational director certification, offering the following explanation:

> Well, when you spend a certain percentage of time doing supervisory jobs, going out into the schools, overseeing the teachers, helping the teachers if they needed help with special projects, making sure that what they did and what they taught was in line with what the state expected, if you were doing that kind of work, then you were considered to be a supervisor. And she was doing that kind of work most of the time if not all the time.

(Stewart's Dep. (ECF No. 43-5) at 21-22.) Harris testified that plaintiff was a supervisor requiring additional certification, explaining that plaintiff supervised business education teachers and performed the following supervisory duties:

> consulting with the teachers, conferring with the teachers, giving teachers pointers in terms of their job responsibilities. That was the role the supervisor served, as well as evaluate.

(Harris' Dep. I (ECF No. 43-4) at 50.)

While working as a staff specialist, plaintiff never contested the assertion by PPS that she lacked a vocational supervisor or vocational director certification to do her job according to PDE standards. (Pl.'s Dep. (ECF No. 43-2) at 57.) On June 6, 2008, almost eight months after

receiving the letter and PDE memorandum, plaintiff sent an email to Chester, Harris, and Stewart, among others, writing: "I acknowledge that I do not possess the required certification." (ECF No. 60-1 at 28.) On August 17, 2008, plaintiff completed an Internet Initial Claims form with the Department of Labor & Industry, Bureau of Unemployment Compensation benefits and Allowances, in which she wrote: "I worked as a Teacher on Special Assignment in a supervisory capacity (192 days) for over 10 years." (ECF No. 60-1 at 13.)

Prior to September 19, 2007, plaintiff, along with Banks, Anderson, and W. Cook, met with D. Gamble to learn what the certification requirements were under chapter 339 and what steps were necessary to achieve those certifications. (Stewart's Dep. (ECF No. 43-5) at 13; Pl.'s Dep. (ECF No. 43-2) at 51-52, 179-80; Banks' Dep. (ECF No. 43-8) at 29, 32.) It was Stewart's position that plaintiff, Banks, Anderson, and W. Cook could not "continue to work in the position[s] they were unless they became certified and made some effort to do it." (Stewart's Dep. (ECF No. 43-5) at 44-45.) Anderson was enrolled at IUP to obtain the required certifications, but retired before she became certified. (Pl. 61; Stewart 19-20.) W. Cook obtained his certification, but retired as well. (Pl.'s Dep. (ECF No. 43-2) at 62; Deposition of Yvette Cook ("Y. Cook's Dep.") (ECF No. 43-10) at 41.) Banks decided not to obtain the supervisory certification. (Banks' Dep. (ECF No. 43-8) at 16.)

Plaintiff testified that she had every intention of enrolling in the program at IUP to obtain the necessary certification, but Harris, Stewart, or D. Gamble never explained that process to her. (Pl.'s Dep. (ECF No. 43-2) at 53; Pl.'s Aff. (ECF No. 51-1) ¶ 8.) Plaintiff testified that Harris contacted her with respect to whether she had enrolled in classes to obtain the supervisory certification, and that she told Harris that she had not yet registered, but was "looking at the website." (Pl.'s Dep. (ECF No. 43-2) at 54.) Plaintiff testified that no one explained to her that

she only had to enroll in classes for nine credits per year and could obtain an emergency permit to maintain her staff specialist position. (Pl.'s Dep. (ECF No. 43-2) at 53.)

Plaintiff asserts that she eventually decided not to pursue the certification because she would not have the time as a full-time student to complete the required coursework. (Affidavit of Plaintiff ("Pl.'s Aff.") (ECF No. 51-1) ¶¶ 8, 9.) Plaintiff learned about the option of obtaining an emergency permit while taking classes for nine credits per year to maintain her position from Harris' notes. (Pl.'s Dep. (ECF No. 43-2) at 53-54.) In those notes, Harris referred to a telephone call with Banks in which she informed Banks that obtaining an emergency permit was an option. (Id.) Harris' notes provided in pertinent part:

> Cherri asked if anyone, other than the Superintendent, has a waiver of certification. I told her that he was the only one that was issued a waiver by the state since he was a non-traditional superintendent. I told her that we issue emergency [permits] for individuals to enable them to complete their certification requirements and that is what she would be getting once she is enrolled in a program. The requirement is to complete 9 credits a year until the certification is complete.

(ECF No. 51-1 at 15.) Harris testified that the option to obtain an emergency certification did not apply to Davis because she did not have a supervisory or administrative certification, either of which are prerequisites for the vocational director or vocational supervisory certificate. (Harris' Dep. I (ECF No. 43-4) at 62.)

On September 11, 2007, plaintiff emailed Anderson and copied Banks on the email writing: "As discussed at the meeting with Don Gamble, please send us the website for IUP's certification program." (ECF No. 43-3 at 22.) On September 19, 2007, plaintiff emailed D. Gamble inquiring about IUP's website and information with respect to what she needed to do to obtain her certification. (Id. at 27.) D. Gamble responded to plaintiff's email later that same day with a link to IUP's website, writing "[l]ook this over and give me a call." (Id.) Plaintiff did not

again communicate with D. Gamble until she emailed him on April 1, 2008, informing him that she had been off work on sick leave from December 2007 through April 1, 2008. (Id. at 26.) Plaintiff wrote: "I am going to look at the website again to see what I need to do to get certified. I think the next class starts in September is that correct?" (Id.) D. Gamble responded to plaintiff's email on the same day informing her that registration for the fall semester began on March 31, 2008, and fall classes would begin on August 25, 2008. (ECF No. 43-3 at 26.) D. Gamble requested that plaintiff look over the information about applying to IUP's graduate school. (Id.) D. Gamble forwarded plaintiff's September 19, 2007 email, his response to that email, plaintiff's April 1, 2008 email, and his response to that email to Harris on June 9, 2008. (Id.)

Plaintiff received the October 19, 2007 letter from Chester instructing her to contact Harris about her plans with respect to obtaining the certification, but she never contacted Harris with respect to whether she intended to seek the required certifications. (Pl.'s Dep. (ECF No. 43-2) at 188.) Plaintiff never communicated to Stewart that she was interested in pursuing the certifications at issue in the upcoming 339 audit. (Stewart's Dep. (ECF No. 43-5) at 49.) Stewart testified that during a meeting in her office with plaintiff, plaintiff was "very noncommittal" with respect to whether she was going to obtain the supervisory certification. (Id. at 19.) Plaintiff never enrolled in courses to obtain her supervisory certificate. (Pl.'s Dep. (ECF No. 43-2) at 30.)

As referenced above, plaintiff was on medical leave from mid-November 2007 through April 2008. (Pl.'s Aff. (ECF No. 51-1) ¶ 6; ECF No. 43-3 at 26.) In January 2008, Yvette Cook ("Y. Cook"), a CTE teacher at Carrick High School ("Carrick"), ceased working as a teacher at Carrick and began working in the CTE department to assist Stewart in preparing for the upcoming 339 audit. (Y. Cook's Dep. (ECF No. 43-10) at 7-8.) Y. Cook testified that she was asked to work in the CTE department because she "was the only one in the school district

certified as a supervisor of vocational education." (Id. at 7.) Y. Cook had the following certifications: instructional II in distributive education; instructional II in cooperative education 7-12; instructional II in secretarial 7-12; instructional II in typewriting; supervisory I in vocational education; and administrative I in secondary principal. (ECF No. 51-1 at 43.) In her position at the CTE central office, Y. Cook worked with the business education teachers to make sure that all essential documentation relating to each business program was in order for the audit. (C.S.F. (ECF No. 62) ¶ 38; Y. Cook's Dep. (ECF No. 43-10) at 9.)

Plaintiff returned to work in the CTE central office in April 2008. (ECF No. 43-3 at 26.) On June 5, 2008, plaintiff received an email from Chester and Mona Dine ("Dine"), director of recruiting and staffing for PPS, with respect to her position in the CTE department. (ECF No. 43-3 at 28.) The email provided:

> As you are aware, a PA Career and Technical Education Supervisor is required to have a valid Career and Technical Education Supervisor Certificate. You do not possess this Certificate. As such, you are not qualified to continue in your role in CTE and will be reassigned back into the classroom according to your qualifications. Your current position ends on June 13, 2008 in accordance with your 10 month contract.
>
> If you have any questions, please do not hesitate to contact me.

(Id.) Davis testified that she was not surprised by this email because it was a follow-up to the letter she previously received from Chester with respect to the certification issues. (Pl.'s Dep. (ECF No. 43-2) at 71-72.)

On June 6, 2008, plaintiff emailed Dine. Plaintiff, in pertinent part, wrote:

> I realize that I do not possess the required certification. However, are [sic] aware, that the state will allow a non-certified person to remain in a position as long as they become certified within three years of notification?

(ECF No. 43-3 at 31.) On June 9, 2008, Dine responded to plaintiff's email, writing:

> I am not aware of the State requirement of becoming certified within three years of notification. If you have any information on this, please provide [sic] to me. Please let me know if you have any questions or would like to discuss further.

(Id.) Plaintiff's last day as a staff specialist in the CTE central office was June 13, 2008. (Pl.'s Dep. (ECF No. 43-2) at 71; ECF No. 43-3 at 28.)

### Curriculum Coordinator Position - Banks

As a teacher on special assignment, plaintiff had a ten-month contract with PPS, meaning she worked during the academic year, which amounted to 192 days per year. (ECF No. 43-3 at 15, 28.) As an ATCD Staff Specialist, Banks was paid on the Support Administrators Salary Plan. (ECF No. 60-5 at 6.) Banks worked throughout the summer months. (Banks' Dep. (ECF No. 43-8) at 24.)

Banks continued to work in the CTE central office from June 2008 through October 2008. (Banks' Dep. (ECF No. 43-8) at 19-20.) It was Stewart's intention as early as April 17, 2008 to "[r]etain Dr. Cherri [sic] Banks until the end of summer to assist with Chapter 339 revisions at which time she may move on to another designated position in the district." (ECF No. 51-1 at 22, 28.) During the summer months, Banks did not have much involvement with teachers because they were off for the summer. (Banks' Dep. (ECF No. 43-8) at 24.) In explaining why she retained Banks instead of Davis, Stewart testified that Banks and Davis

> were two different people with two different sets of skills and certifications. Dr. Banks not only had her doctorate, which Ms. Davis did not, Dr. Banks also had her superintendent's papers which gave her knowledge that Ms. Davis did not. She had worked as a principal that Ms. Davis didn't have that knowledge base and also as a deputy superintendent or assistant superintendent. So she had a lot of knowledge in a lot of different areas that Ms. Davis did not possess, and she had been in career and technical education, you know, for a while and she had become quite knowledgeable about that. And I just felt that she had a great knowledge base and that she'd be able to be of help to me, and that Ms. Davis didn't have the same qualifications.

(Stewart's Dep. (ECF No. 43-5) at 33-34.) At first, Stewart did not intend to have Banks employed in the CTE central office after the summer of 2008. (Id. at 41.) Stewart testified:

> I found that over the summer [Banks] was a great help to me in preparation for the audit and I knew the audit was coming up in the fall, and I asked Dr. Lane and Mr. Camarda in charge of budgeting if we could find some money and talk to Dr. Lane about the possibility of her continuing to work. We needed the help badly.

(Id.) Stewart testified that she tried to

> find a way to have [Banks] continue to help [her] and to find a job that she could do in a job description that would fit what [Stewart] needed done and what the Pittsburgh Public School District had in their resources of jobs that would be equal to the amount of money she was currently earning, because they didn't want to give her a promotion.

(Id. at 42.) If Banks was going to stay in the CTE central office after August 2008, a job needed to be created for her. (Id. at 43.) Stewart worked with Chester and Linda Lane, Deputy Superintendent of Instruction, Assessment and Accountability, with respect to Banks remaining employed in the CTE central office. (Stewart's Dep. (ECF No. 43-5) 43-44; Dobies-Sinicki's Decl. (ECF No. 43-6) ¶ 12.)

On October 27, 2008 and through October 31, 2008, PPS posted a position for CTE curriculum coordinator. (ECF No. 51-4 at 19-21.) Plaintiff knew that the coordinator position had been posted, but did not apply for the job. (Pl.'s Dep. (ECF No. 43-2) at 63-65.) The listing for the position indicated the position paid a support administrator's salary. (ECF No. 51-4 at 19.) Banks recalled having one conversation with Chester about needing a job and one conversation with Stewart with respect to whether Banks wanted to continue to work in the CTE central office prior to applying for the curriculum coordinator job. (Banks' Dep. (ECF No. 43-8) at 17-18, 21.) Banks never received a telephone call from the superintendent's office with respect to the coordinator job before she applied for the position. (Id. at 21.) Banks applied and was interviewed and hired for the coordinator position. (Id. at 18-19.)

Plaintiff testified that Banks' position as coordinator of CTE was "the same job description that the three of us did when we were responsible for each different department." (Pl.'s Dep. (ECF No. 43-2) at 60-61.) Banks provided the following testimony with respect to how the staff specialist position compared with the curriculum coordinator position:

> I had no more supervisory responsibilities. It shifted totally to curriculum development, program development around career and technical education standards. And it also shifted to working across, instead of just more high school, it worked across all three levels, elementary, middle and high school, specifically around the implementation and integration of these career education work standards that the governor expected to be taught across school districts, and a lot of work around curriculum development and professional development.

(Banks' Dep. (ECF No. 43-8) at 20.)

### Plaintiff's Furlough

Once the Budget Office of PPS determines each school's budget for the following year, the school determines how many teaching positions are available for the upcoming school year. (Harris' Dep. I (ECF No. 43-4) at 12-13.) If a school has more teachers for the current school year than it does positions for the upcoming school year, "whoever is least senior in the building in that certification is cut from the building." (Id. at 13.) The individuals who are cut from the building are not necessarily laid off. (Id.) They are able to apply for posted positions at other schools based upon their certifications. (Id.) After the teachers who are cut from their schools go through the "posting process" and there are teachers left without a placement, the "bumping" process occurs. (Id. at 13-14.)

Harris described the bumping process as follows:

> [I]f we still have teachers that are displaced and we have no more positions, then we look at the hire date for those individuals that are still out and go through the bumping process to determine who has least seniority in that particular certification area, they come out, the most senior person comes into that positions, and that process continues until we basically have placed all of our more senior people to the extent possible. All remaining that still are out become laid off.

(Harris' Dep. I (ECF No. 43-4) at 13-14; 20-21.) PPS keeps track of teacher certification and seniority in databases that are generated each year. (Id. at 21-22.) PPS has laid off or furloughed teachers in the following content areas: career and technical education; music; art; library; math; and science. (C.S.F. (ECF No. 62) ¶ 109; Wilson's Dep. (ECF No. 43-7) at 8-9.)

On August 5, 2008, plaintiff received a letter from Chester indicating that she would be laid off effective August 21, 2008. (ECF No. 51-1 at 31.) Harris testified that plaintiff was furloughed because there was no teaching position available for which she was certified to teach. (C.S.F. (ECF No. 62) ¶ 127; Harris' Dep. I (ECF No. 43-4) at 27.) Plaintiff contacted Harris after receiving the August 5, 2008 letter. (Pl.'s Dep. (ECF No. 43-2) at 89.) Plaintiff "tried to get [Harris] to explain why [she] was being furloughed when [she]…[was] certified to teach…take a classroom position." (Id. at 89-90.) Plaintiff testified that Harris responded "Your certification is too old." (C.S.F. (ECF No. 62) ¶ 222; Pl.'s Dep. (ECF No. 43-2) at 17, 37, 65, 89-90, 94.) Plaintiff responded "[n]o, it's not." (Id. at 89-90.)

Davis testified that after learning she was being furloughed, she also spoke with Chester, who told her that her "certification was too old for the classes." (C.S.F. (ECF No. 62) ¶ 228; Pl.'s Dep. (ECF No. 43-2) at 187-88, 193.) Plaintiff responded: "But you have three of us who are not certified and Dr. Banks doesn't have a certification, how can she remain employed [sic]." (Pl.'s Dep. (ECF No. 43-2) at 187-88.) Chester stated: "That is a different circumstance. Her situation is different than yours." (Id. at 188.)

### Carrick High School

Carrick has a program called the "Business Academy." (C.S.F. (ECF No. 62) ¶ 154; Y. Cook's Dep. (ECF No. 43-10) at 23; Deposition of Matthew Thompson ("Thompson's Dep.") (ECF No. 43-9) at 17.) In the 2007-2008 and 2008-2009 school years, four teachers taught in the

Business Academy. (ECF No. 51-2 at 1-2.) In 2007-2008 the teachers were: Y. Cook; Edward McManus ("McManus")[2]; Brian Hoelzle ("Hoelzle")[3]; and Christopher Milius ("Milius")[4]. (Id. at 1.) In the 2008-2009 school year, the teachers were: McManus; Hoelzle; Milius; and Matthew Thompson ("Thompson")[5]. (Id. at 2.) After she became an Instructional Team Leader ("ITL") in 2006, Y. Cook taught five periods per day before she left Carrick. (C.S.F. (ECF No. 62) ¶ 177; Y. Cook's Dep. (ECF No. 43-10) at 39-40, 52-53.) The other teachers in the Business Academy ordinarily taught at least six periods per day. (Y. Cook's Dep. (ECF No. 43-10) at 40.) ITLs are chosen by a vote of the teachers within that department, and they must have training and meet certain other requirements. (See C.S.F. (ECF No. 62) ¶ 177 n.38; Y. Cook's Dep. (ECF No. 43-10) at 16, 39, 52-53; ECF No. 43-1 at 9-10.)

The schedule of classes taught by each teacher in the Business Academy during the 2007-2008 year was as follows:

| Y. Cook | Hoelzle |
| --- | --- |
| Integrated Business Procedures | Accounting 2 |
| Intro to Entrepreneurship (double period) | Accounting 1 |
| Intro to Entrepreneurship (double period) | Accounting 1 |
| ITL | Business Law Seminar |
| | Accounting 1 |

---

[2] McManus had Instructional II certification in Accounting 7-12, Data Processing, and Office Technologies. (ECF No. 43-1 at 13.)

[3] Hoelzle had Instructional II certification in Mid-Level Mathematics 7-9, Office Technologies, Data Processing, and Accounting 7-12. (ECF No. 43-1 at 26.)

[4] Milius had Instructional II certification in Accounting 7-12, Data Processing, and Office Technologies. (ECF No. 43-1 at 25.)

[5] At the beginning of the 2008 school year, Thompson had Instructional II certification in Business Computer Information Technology K-12. He was issued an Instructional II certification in Marketing/Distributive Education Teacher Coordinator during that same school year. (ECF No. 43-1 at 12.)

| **McManus** | **Milius** |
|---|---|
| Business Foundations | Business Practices |
| Excel/Access | Business Practices |
| Computer Applications Seminar | Yearbook |
| Business Foundations | Web Design Seminar |
| Business Foundations | Business Practices |
| Excel/Access | Business Practices |
| | Business Practices |
| | Business Practices |
| | Intro to Entrepreneurship (double period) |

(ECF No. 51-2 at 1, 6-12.) When Y. Cook began working in the CTE central office, a substitute teacher worked in her place at Carrick for the second half of the 2007-2008 school year. (Deposition of Edward McManus ("McManus' Dep.") (ECF No. 51-9) at 18-19; Pl.'s Aff. (ECF No. 51-1) ¶ 8.)

Within PPS, teachers' schedules are developed in a process by which at the end of a school year, teachers submit their course preferences to the school's principal for the following school year. (ECF No. 43-1 at 7-8; McManus' Dep. (ECF No. 51-9) at 12-13.) The school's principal creates the teachers' schedules based on the teachers' preferences and the courses students sign up for during registration. (Id.) To create the schedule for the 2008-2009 school year, the Carrick Business Academy teachers submitted their course preferences in March 2008. (McManus' Dep. (ECF No. 51-9) at 11-12; ECF No. 43-1 at 7-8.) They knew the courses they were going to teach in the 2008-2009 school year before the end of the 2007-2008 school year. (McManus' Dep. (ECF No. 51-9) at 11-12.) Teaching schedules are "tentative to the extent that staffing changes, etc., in the new school year could require alterations in them." (ECF No. 43-1 at 7-8.)

In light of Y. Cook's transfer to the CTE central office, there was an open teaching position at Carrick in the Business Academy for the 2008-2009 school year. (Thompson's Dep. (ECF No. 43-9) at 12, 17.) Before the start of that school year, McManus orchestrated a change

in the Business Academy teachers' schedules. (McManus' Dep. (ECF No. 51-9) at 25, 33-34; Thompson's Dep. (ECF No. 43-9) at 16-17.) McManus testified that the teachers in the Business Academy "would request the [classes they] taught the year before." (McManus' Dep. (ECF No. 51-9) at 11.)[6]

The person filling Y. Cook's vacant position was scheduled to teach at least one Business Foundations course in the 2008-2009 school year prior to the changes made by McManus. (McManus' Dep. (ECF No. 51-9) at 24-25; Thompson's Dep. (ECF No. 43-9) at 16-17.) McManus was also scheduled to teach at least one, if not more, Business Foundations course that same year. (Id.) McManus testified that he "designed, taught, and developed" the course materials for the Business Foundations course prior to the 2008-2009 school year. (McManus' Dep. (ECF No. 51-9) at 25.) In an effort to create consistency, prior to the start of the 2008-2009 school year, McManus swapped the Computer Applications class from his schedule with the Business Foundation class from the schedule the vacant position was to teach. (Id. at 24-25.)

Approximately two weeks before the start of the 2008-2009 school year, Thompson was furloughed from Rogers CAPA ("Rogers"), where he taught mostly computer classes. (Thompson's Dep. (ECF No. 43-9) at 9-10.) On August 26, 2008, Harris telephoned Thompson to inform him that there was a position available for him at Carrick teaching computer applications, i.e., the position created in Y. Cook's absence, which he accepted. (Id. at 11-12.) Thompson testified that during the telephone call on August 26, 2008, Harris did not divulge any information with respect to the schedule of classes he would be teaching at Carrick. (Id. at 12.) On August 26, 2008, Thompson emailed his colleagues at Rogers informing them that he was

---

[6] There is no evidence of record with respect to what the Business Academy schedule was in its entirety prior to the changes orchestrated by McManus, i.e., what the complete schedule was that the teachers received at the end of the 2007-2008 school year. (McManus' Dep. (ECF No. 51-9) at 11.)

"the new Computer Applications Teacher at Carrick High School." (ECF No. 51-14 at 35.)

Thompson did not learn which courses he was scheduled to teach at Carrick for the 2008-2009

school year until the morning of the first day students arrived for that school year. (Thompson's

Dep. (ECF No. 43-9) at 16; McManus' Dep. (ECF No. 51-9) at 25.) Thompson testified:

> For the first year, I didn't find out [what classes I would be teaching] until the
> first day the kids showed up. My first day of work was a professional
> development day in the district. I was stuck in meetings and had no clue what
> book I was teaching, what classes I was teaching. The morning that the students
> arrived, was when I found out what I was teaching.

(Thompson's Dep. (ECF No. 43-9) at 16.) Thompson testified that it was his understanding,

based upon conversations that he had with McManus that the changes to the Business Academy

schedule were made prior to his placement at Carrick. (Id. at 17.)

On August 27, 2008, the day after Thompson was offered the position at Carrick, Vivian

Kowalski ("Kowalski"), a teacher in the CTE department at Westinghouse High School

("Westinghouse"), received a telephone call from Harris. (Affidavit of Vivian Kowalski

("Kowalski's Aff.") (ECF No. 51-1) ¶ 5; ECF No. 51-1 at 11.) Harris asked Kowalski whether

she

> would be willing to switch positions with a person scheduled to teach at Carrick
> High School. Ms. Harris said the teacher was not comfortable with the curriculum
> the person was assigned to teach, and the other faculty members were worried
> about the students.

(Kowalski's Aff. (ECF No. 51-1) ¶ 5.) Kowalski responded by asking Harris "if the teacher was

accounting certified because the classes [Kowalski] taught at Westinghouse required an

Accounting certification." (Id.) Harris responded "that will not work" and hung up the phone.

(Id.) Kowalski recalls that during the telephone call on August 27, 2008, Harris "said the person

assigned to Carrick was not comfortable teaching the Entrepreneurship classes." (Id. ¶ 6.)

In an email dated August 27, 2008, Hoelzle informed a PPS colleague that Thompson "seem[ed] really overwhelmed." (ECF No. 51-1 at 36.) Hoelzle wrote: "He is going to teach comp apps and office here. The principal set his schedule up like that and gave us Yvettes [sic] classes. He student taught here a few years back. He seems really overwhelmed but I am sure he will be fine." (Id.)

Hoelzle testified that the selection of courses went by seniority in the building and that with respect to the Intro to Entrepreneurship classes that Y. Cook taught in the 2007-2008 school year, they "went to Milius, because he was the next person up." (Deposition of Brian Hoelzle ("Hoelzle's Dep.") (ECF No. 43-12) at 15.) Thompson testified that the Intro to Entrepreneurship classes "were all absorbed by Chris Milius." (Thompson's Dep. (ECF No. 43-9) at 17.)[7]

Thompson had, among others, an Instructional II certification in Business Computer Information Technology K-12. (ECF No. 51-1 at 44.) That certification covers the business courses, including accounting, computers, and economics, which were subject to separate certifications in the 1980s and 1990s. (C.S.F. (ECF No. 62) ¶ 144; Turner's Dep. (ECF No. 43-14) at 26, 34-35; Thompson's Dep. (ECF No. 43-9) at 6-7.) When asked whether McManus would have accommodated plaintiff if her assignment to Carrick was contingent upon a certain class schedule, McManus responded that he did not make the switch in the schedule with respect to the Business Foundations classes "so much to accommodate [Thompson], but to accommodate the students." (McManus' Dep. (ECF No. 51-9) at 33.) McManus testified that Thompson was certified to teach any business class. (Id. at 26.)

The schedules of classes actually taught by each teacher in the Business Academy during the 2008-2009 year were as follows:

---

[7] It is unclear why or when, i.e., before or after Thompson accepted the placement at Carrick, Milius was assigned the Intro to Entrepreneurship classes for the 2008-2009 school year.

| **Thompson** | **Hoelzle** |
|---|---|
| Computer Application Seminar | Accounting 1 |
| Computer Application Seminar | Accounting 1 |
| Microsoft Office 1 | Accounting 2 |
| Excel/Access | Computer Application Seminar |
| Excel/Access | Personal Finance/Business Law Seminar |
| | Web Design Seminar |

| **McManus** | **Milius** |
|---|---|
| Business Foundations | Yearbook 1 |
| Business Foundations | Business Practices |
| Business Foundations | Integrated Business Procedures 1 |
| Business Foundations | Intro to Entrepreneurship (double period) |
| Microsoft Office 1 | Intro to Entrepreneurship (double period) |
| ITL | Business Practices |
| | Business Practices |
| | Business Practices |
| | Business Practices |
| | Business Practices |
| | Business Practices |
| | Business Practices |
| | Business Practices |

(ECF No. 51-2 at 2, 6-12.) Plaintiff believes she had the proper certification to teach the following courses at Carrick for the 2008-2009 school year: Intro to Entrepreneurship; Integrated Business Procedures I; Business Foundations; and Personal Finance/Business Law. (Pl.'s Dep. (ECF No. 43-2) at 123-29; Pl.'s Aff. (ECF No. 51-1) ¶¶ 13, 18, 19; ECF No. 43-3 at 45.) Plaintiff asserts that she "know[s] from personal knowledge that the teachers at Carrick would have worked with [her] by swapping classes to make a schedule that [she] could teach based on [her] certifications in the 2008-2009 school year." (Pl.'s Aff. (ECF No. 51-1) 14.) With respect to the Intro to Entrepreneurship class, Harris testified that she believed plaintiff's Distributive Education certification allowed her to teach entrepreneurship and basic marketing. (C.S.F. (ECF No. 62) ¶ 141; Harris' Dep. I (ECF No. 43-4) at 82-83.)

Plaintiff's belief that she had the proper certification to teach Integrated Business Procedures I, Business Foundations, and Personal Finance/Business Law is based upon an

interpretation of CSPG 49 that plaintiff was certified to teach general business courses. (Pl.'s Dep. (ECF No. 43-2) at 35-36.) Plaintiff has no certification or training with respect to knowing which courses a teacher with a specific certification may teach pursuant to that certification. (Id. at 171.) Plaintiff never had a discussion with anyone at PDE with respect to whether her certifications permitted her to teach Business Foundations or Integrated Business procedures. (Id. at 131-33.)

With respect to Integrated Business Procedures, Y. Cook offered the following description of the course:

> It's an advanced course for seniors, that showcased the student's talents in different software packages, Excel, Spreadsheet, database would be the Access, PowerPoint and word processing. And a student would be able to bounce between those software programs to do bigger projects.

(Y. Cook's Dep. (ECF No. 43-10) at 54.) Y. Cook testified that her certification in typewriting permitted her to teach Integrated Business Procedures. (Id. at 54-55.) Y. Cook explained the difference between her certification in typewriting and the certification held by Thompson in business information technology K-12:

> When I was last there, I had the oldest, certifications, as the oldest person. I had typewriting, I had shorthand. They were older certifications that the State moved away from.

> The newer certified teachers there like Matt Thompson, as an example, his certification was much broader than the older stuff that the PDE gave. So he had what was known as a BIT, business information technology, and it was K-12. It was much broader. It included marketing, it included accounting and it included all business education. So that was a much broader certification.

(Id. at 51-52.) When asked whether she could teach Microsoft based courses, Y. Cook responded: "Yes, I could do that with the typewriting business certification. I would not have been able to teach the accounting, because that was a separate certification in my time." (Id. at 52.)

Karen Turner is an employee of the PDE responsible for "validity of certificates, staffing policies and guidelines, and school audits" and "review[ing] job descriptions to determine what certificate[s] should be used." (Turner's Dep. (ECF No. 43-14) at 5-6.) Turner is responsible for determining what CIP codes apply to a course created by a school district. (Id. at 23-24.) Turner considers the following criteria, among other factors, to determine whether a particular course fits within a certain CIP code: the goals of the course, the content of what is presented, who the supervisor of the course would be, and the organizational structure with respect to the course. (Id. at 24-25.)

The relevant CSPG with respect to plaintiff's marketing (distributive) education certification during the relevant time period in this case was CSPG No. 49 dated July 1, 2004 (the "2004 CSPG No. 49"). (ECF No. 51-3 at 14.) Following the issuance of the 2004 CSPG No. 49, the PDE sought to clarify the areas a person with that certification could teach. (Turner's Dep. (ECF No. 43-14) at 11-12, 14.) On January 1, 2010, the PDE issued an updated CSPG No. 49 (the "2010 CSPG No. 49"). (ECF No. 51-3 at 11-13.) Turner testified with respect to the difference between the 2004 and 2010 CSPG No. 49:

> [W]e made it much more specific on paper as to what this marketing/distributive ed person could teach because of many questions we've had and **we did not change what this person could do**, we just clarified what they can do and made it more specific on paper.

(Turner's Dep. (ECF No. 43-14) at 14) (emphasis added.) As noted by plaintiff, the 2004 CSPG No. 49 references the CSPG for the Business, Computer and Information Technology certification, CSPG No. 33. (ECF Nos. 51-3 at 8, 14.) Although the 2010 CSPG No. 49 does not contain the reference to CSPG No. 33, the scope of coverage for both the 2004 and 2010 CSPG No. 49 are the same. (Turner's Dep. (ECF No. 43-14) at 14.) One paragraph of CSPG No. 33 provides: "Individuals holding valid PA certificates for…Marketing…may teach general

business courses…." (ECF No. 51-3 at 9.) Turner testified that the business education marketing certification, which is referenced in CSPG 33, is a different certification than the marketing (distributive) education certification held by plaintiff. (Turner's Dep. (ECF No. 43-14) at 28.) Turner explained:

> Well, the marketing piece of that business group is not as broad. It's not as in-depth at all but it has more of a general business focus whereas they can teach general business practices, some things like Business English, Business Math, Basic selling procedures. But the distributive ed marketing piece is much more in-depth with the marketing program and it has a different focus, a marketing focus rather than a business piece.

(Id.) Turner clarified that a "[d]istributive certificate is not a business certificate directly, it is a marketing – it's not the Category 4 business per se." (Id.) Under the heading "Certificate Clarification," the 2004 CSPG No. 49 provides: "This is not the same certification as the Marketing certificate issued under the older Business Education's Marketing State Board Standards." (ECF No. 51-3 at 14.) The 2010 CSPG No. 49 has a similar provision and under the heading "Clarification," it reads:

> Marketing 7-12 (1640) is one of five older Business areas of certification and not to be confused with Marketing (Distributive) Education K-12 explained in this CSPG….This Marketing 7-12 certificate was no longer issued after 9/30/2003 and was replaced by Business Computer Information Technology K-12 (BCIT), a comprehensive certificate covering the older 5 business area in scope.

(Id. at 12.)

When asked whether a distributive education certificate could be used to teach a general business course, Turner responded:

> Usually not but I would – for me to give a thoroughly accurate answer on this specific group of courses, I would first want to check with bureau career and tech to be sure what programs are running behind these courses just to be sure I'm on the right track here.

(Turner's Dep. (ECF No. 43-14) at 29.)

The CTE curriculum included several courses, including, among others, Computer Applications, Introduction to Entrepreneurship, Accounting I and II, Business Foundations, and Integrated Business Procedures. (Id. at 39.) Turner testified about which courses a teacher with a marketing (distributive) certificate could teach that were offered by the district's CTE curriculum. (Id.) Turner stated that "[i]t might appear that the career and development could be under the marketing – or distributive ed. There's several focuses that course can take.…I would look further into the Introduction to Entrepreneurship. I would like to look a lot more thoroughly at that." (Id.)

When asked which certifications could be used to teach Integrated Business Procedures, Turner stated:

> On the surface, **it appears that a business certificate would be needed**, either **business computer information technology** which includes all of the old business certificate areas that we had in the '90s and '80s, but it has a specific accounting piece to it. So if we were going to older certificates besides a business computer information technology, we would have to include somebody that had an **accounting certificate** in there for at least just the accounting piece. The other pieces could fit any general – any business area that we've had.

(Turner's Dep. (ECF No. 43-14) at 26) (emphasis added.) In determining which CIP applies to the Integrated Business Procedures course, Turner would

> want to talk to Marlene Harris and ask her some questions about what is the credit these students are going to get…and is this offered to just career and tech ed people?…I would want to clarify that this is a business focus. My other questions might be as far as a career part of this, you know, explain it further to me what the goals are as far as career education in this that are involved in this. Because off of the top it looks and appears to be something that has some computer areas in it but it looks very business to me, very general business application to me, which I would just assume could be a business computer information tech certificate or any of the former five business certificates [office technology, data processing, business marketing, accounting] except for the accounting piece.

(Id. at 27-28.) The business computer information technology certificate, CSPG 33, would enable a teacher to be properly certified to teach the Integrated Business Procedures Course. (Id.

at 41-42.) Turner does not recall any conversations or communications with Davis in 2008. (Id. at 37, 38.)

## Allderdice High School

Brandy Ralston ("Ralston") was a teacher in the CTE department at Allderdice High School ("Allderdice"). (Pl.'s Aff. (ECF No. 51-1) ¶¶ 11, 20; Pl.'s Dep. (ECF No. 43-2) at 98-99.) Ralston taught Sales Merchandising, Marketing Education, Marketing Lab, and two periods of Web Design Seminar during the 2007-2008 school year. (ECF No. 51-2 at 24-25.) According to plaintiff, Ralston taught marketing classes and a web design class at Allderdice in the 2008-2009 school year. (Pl.'s Dep. (ECF No. 43-2) at 99.) Plaintiff acknowledges that she was not certified to teach Ralston's web design class. (Pl.'s Dep. (ECF No. 43-2) at 100; Pl.'s Aff. (ECF No. 51-1) ¶ 21.) Plaintiff asserts that Business Foundations and Intro to Entrepreneurship were offered at Allderdice and she is "sure the teachers at Allderdice would have worked with [her] to create a schedule that [she] could teach based on [her] certifications just as the teachers at Carrick did for Thompson." (Pl.'s Aff. (ECF No. 51-1) ¶ 21.)

## PFT's Involvement[8]

As of 2011, Sylvia Wilson ("Wilson") was employed by PFT as the assistant to the PFT president, and had worked for PFT for more than eleven years. (Wilson's Dep. (ECF No. 43-7) at 4, 5.) Prior to her employment with PFT, Wilson was employed as a classroom teacher for twenty-six years. (Id. at 4.) In 2008, Wilson's responsibilities at PFT included serving as liaison to the human resources department of PPS, and she worked with Harris on professional employee issues. (Id. at 6, 7.) Wilson was responsible for monitoring PPS furloughs for several years. (C.S.F. (ECF No. 62) ¶ 112; Wilson's Dep. (ECF No. 43-7) at 10.) Wilson would learn

---

[8] Plaintiff's claims against PFT are based upon her not being placed in a teacher's position. (Pl.'s Dep. (ECF No. 43-2) at 179, 181.) Plaintiff does not question PFT's failure to act in response to her removal from her position as a staff specialist. (Id.)

which teachers would be furloughed about a week before the teachers learned about their furloughs. (C.S.F. (ECF No. 62) ¶ 113; Wilson's Dep. (ECF No. 43-7) at 11.) Wilson would review a list prepared by Harris of teachers who would be displaced by seniority and certification. (C.S.F. (ECF No. 62) ¶¶ 115-116; Wilson's Dep. (ECF No. 43-7) at 11; Harris' Dep. I (ECF No. 43-4) at 23-24; ECF No. 43-4 at 16-20.) Once Wilson received the list, she would schedule meetings with the furloughed teachers to discuss unemployment compensation and other benefits. (C.S.F. (ECF No. 62) ¶ 117; Wilson's Dep. (ECF No. 43-7) at 12.)

On August 13, 2008, PFT held a meeting with teachers who were notified that they were furloughed for the upcoming school year. (Pl.'s Dep. (ECF No. 43-2) at 95-96.) Plaintiff, Wilson, and Harris, among others, attended this meeting. (Id. at 96.) Following the meeting, plaintiff had a conversation with Wilson. (Id. at 97.) Plaintiff testified with respect to the conversation she had with Wilson:

> I went to her and I asked her why was I furloughed and I wanted to know about my certification. She said "Well, the book shows a different CIP code for your certification in this."
>
> I said, "It doesn't matter. The state is encompassing all of these. They are changing codes, changing titles, but it is not changing certifications." I said to her, "Well, then, why am I here."
>
> She says, "Well, your certification is too old."
>
> I said "No, it's encompassed in this certification." So then I said asked what about Brandy Rolston's [sic] position, she is marketing certified and teaching marketing and I am marketing certified.
>
> She said, "It's a different code."
>
> I said, "It does not matter, it is the same thing." She said, "It's a different code." I said, "It does not matter, it is the same thing."
>
> So she said she would look into it, but that really didn't go too far with her looking into it.

And I asked her, I said, "What code are they using." So the codes with the organization probably were all changed and the state is doing all of the changing of codes, but it is not affecting certifications.

So, you know, nothing was resolved that day. I called Marlene – Sylvia two or three other times without any callbacks. I called the state to get some clarification. I got some clarification from Karen Turner. I tried to call Sylvia, she was out of town. I e-mailed Sylvia to say this is what Karen said, and she gives me permission for you to call her. Sylvia never called her.

(Id. at 96-98.) Wilson testified that she "may have said" that plaintiff's certification was "not current," but she did not remember using the word "old." (Wilson's Dep. (ECF No. 43-7) at 37.) On August 14, 2008, plaintiff emailed Wilson writing that the marketing and distributive education certifications were "one and the same," Turner confirmed they were one in the same, and Wilson could call Turner to confirm what plaintiff was telling her. (ECF No. 51-1 at 32-33.) Turner testified that she did not recall ever having a conversation with plaintiff in 2008. (Turner's Dep. (ECF No. 43-14) at 37.)

According to plaintiff's notes, after August 14, 2008, she called Wilson at least three times with respect to her furlough status. (ECF No. 43-3 at 44.) Plaintiff's notes provide the following detail with respect to those phone calls:

Aug 29 – Called PFT and requested a grievance form be mailed to me. Did not receive it.

Sept 4 – Called Sylvia..[sic] Informed cannot file a grievance due on [sic] furlough status. Advised me that I should be the next one to be called back. States she had heard that someone was called bak [sic] and it should have been me. She will check into it. – I did not hear from her until I receive [sic] her letter dated [sic]

Sept 11 – Called Sylvia Wilson – Left message to call me…did not call

Sept 17 – Called Sylvia – Shye [sic] was out of town

…

No further conversations with HR or PFT until I received a letter on _____ [sic] from Sylvia Wilson.

(Id.)

Plaintiff asked Wilson if she could file a grievance, but Wilson told her that she did not have a right to file a grievance because she was on furlough. (Pl.'s Dep. (ECF No. 43-2) at 104-05.) After learning about Thompson's placement at Carrick, plaintiff "approached the union on August 29 and requested a grievance form be mailed to [her]," and on September 4, 2008, she spoke with Wilson and "asked the union to file a grievance on [her] behalf because [she] was not placed at Carrick or Allderdice despite [her] seniority and certifications." (Pl.'s Aff. (ECF No. 51-1) ¶ 30.) Plaintiff did not speak to anyone else besides Wilson with respect to her ability to file a grievance. (Id.) Wilson testified that if a teacher who has been furloughed by PPS asked PFT to file a grievance, PFT could pursue that issue only if the actions alleged by PPS violated the collective bargaining agreement between PFT and PPS. (Wilson's Dep. (ECF No. 43-7) at 36.)

Wilson testified that she spoke with Harris and "somebody else in CTE" with respect to plaintiff's certification issues. (Id. at 26-27; 34.) Wilson explained:

> And it seemed to me at that time, that they were telling – and I know Emily had gotten information about it, but what the State was telling the school district, was being adhered to. And it wasn't frivolous or anything, and it was just that this is what they said, was to deal with the certifications.
>
> So I had to go with those who dealt with those certification issues.

(Id. at 26-27.) On October 6, 2008, Wilson sent plaintiff a letter in response to her telephone calls and concerns with respect to her furlough status and certification issues. (ECF No. 51-1 at 39; Wilson's Dep. (ECF No. 43-7) at 31.) Wilson wrote, in pertinent part:

I want to assure you as well, I did look at the others who also hold the same certificate areas as you do. Those who have less seniority are not currently using the certificates in which you hold. They are using other certificate categories.

I know that you showed me the letter[9] with wording that you said is the same as distributive education (I believe that is the area). However, unless the state actually has a listing with a specific code, none of the 501 school districts could accept as fact, a letter that includes such "wording," as an official certificate category. (Even if the categories are similar.) Although the work is similar, the School District has to abide by your specific certification at that time.

(ECF No. 51-1 at 39.) Plaintiff did not have any follow-up with Wilson after receiving the letter dated October 6, 2008. (Pl.'s Dep. (ECF No. 43-2) at 106.) Plaintiff never informed Wilson that she believed she was being treated differently based on her age, race, or gender. (Id. at 163.) A grievance was never filed on plaintiff's behalf. (Id. at 104-05.)

### Lincoln Elementary School

There are two ways furloughed teachers can be recalled for service. (C.S.F. (ECF No. 62) ¶ 195; Wilson's Dep. (ECF No. 43-7) at 38; ECF No. 43-1 at 3-6.) First, if there is a vacancy, meaning there is no longer a professional tied to the position due to a death or resignation, or the professional taking another job, PPS has an obligation to contact the furloughed people that have certification for that position, in order of seniority, to move into that vacancy. (Wilson's Dep. (ECF No. 43-7) at 38; ECF No. 43-1 at 5.) The second instance is when a professional requests medical or personal leave and retains their right to return to the position once leave expires. (Wilson's Dep. (ECF No. 43-7) at 38.) In that instance, if the length of leave is forty days or less, the position can be filled by a day-to-day substitute teacher. (C.S.F. (ECF No. 62) ¶ 197; Deposition of Regina Holley ("Holley's Dep.") (ECF No. 51-8) at 16.) If the length of leave is

---

[9] Wilson testified that the letter and wording referred to in the letter dated October 6, 2008 is the information plaintiff sent as an attachment to Wilson in her August 14, 2008 email. There is no evidence of record with respect to what was contained in the attachment. (Wilson's Dep. (ECF No. 43-7) at 32-33.)

more than forty days, a person on furlough is placed in the position based upon his or her certification and seniority. (Holley's Dep. (ECF No. 51-8) at 16.) A day-to-day substitute teacher position can convert to a placeholder position[10] after forty days of continuous coverage for that position. (Id.) Placeholders who had been on furlough continue to move up the salary scale schedule and be paid exactly the same as prior to their furlough. (Wilson's Dep. (ECF No. 43-7) at 38.)

In the fall of 2008, Harris contacted Wilson about a possible substitute teacher position for Davis at Lincoln Elementary School ("Lincoln")[11]. (Id. at 39.) The position was to substitute for Byron Gamble ("B. Gamble"), a sixth, seventh, and eight grade robotics teacher at Lincoln. (Id.) B. Gamble had a certification in industrial arts. (ECF No. 51-4 at 11.)

Regina Holley ("Holley") served as the principal of Lincoln. (Holley's Dep. (ECF No. 51-8) at 5.) The CTE program at Lincoln was a robotics program, which was created in 2007. (Id. at 6, 7.) The robotics program utilized software called "Project Lead the Way" and had a partnership with Carnegie Mellon University's robotics program. (Id. at 6.) Holley hired B. Gamble to facilitate the robotics program. (Id.)

In the fall of 2008, B. Gamble became ill and went on day-to-day sick leave. (Holley's Dep. (ECF No. 51-8) at 7.) Holley testified that "we basically knew that he probably was not going to come back, but he was still going out day-to-day." (Id.) The position was first filled by a day-to-day substitute teacher. (Id. at 8.) In October 2008, at which time B. Gamble had been absent approximately forty days into the school year, Harris contacted Holley with respect to B.

---

[10] Holley testified that a placeholder is the equivalent of a permanent substitute teacher. (Holley's Dep. (ECF No. 51-8) at 16.)

[11] It is unclear from the evidence of record whether Harris or Wilson knew this position was a day-to-day substitute teacher position or if it was a placeholder position.

Gamble's position. (Id. at 8, 32-34.) Harris told Holley that she wanted to place plaintiff in B. Gamble's position until he returned. (Id. at 8.) Holley responded:

> I told her that he would probably be out for the rest of the year but we couldn't – according to union guidelines, it was still his job. And was able to –

> What he basically did was, he followed the guidelines by bringing in his doctor's note, and we forwarded that onto the Health Department at the District level, like we were supposed to.

> And when we did that, he was still able to get his pay. But according to Marlene, she wanted to offer that position to Emily, but Emily didn't want it.

(Holley's Dep. (ECF No. 51-8) at 8.) B. Gamble did not return to Lincoln during the 2008-2009 school year. (Id. at 8-9, 23-24.) Holley testified that she could not put a long-term substitute teacher in B. Gamble's position because he never informed her that he intended to be out on a long-term basis. (Id. at 10.) A substitute teacher filled B. Gamble's position for the remainder of the 2008-2009 school year. (Id. at 8-9.) After B. Gamble was out for more than forty days, the substitute teacher became a permanent substitute teacher. (Id. at 16.) Whoever filled B. Gamble's position would not have been able to teach the robotics curriculum because he or she would not have been certified to use the Project Lead the Way software. (Holley's Dep. (ECF No. 51-8) at 13, 19,-20, 21-22, 24.)

Harris called plaintiff to tell her that there was an opening at Lincoln, and if plaintiff was interested in taking that position, she would be returned from her furlough. (Deposition of Marlene Harris, Aug. 29, 2011 ("Harris' Dep. II") (ECF No. 43-4) at 20-21.) Holley testified that she never told Harris that she would let plaintiff do "whatever she wanted to do" or that she "would create some kind of a program" for plaintiff. (Holley's Dep. (ECF No. 51-8) at 11.) If plaintiff accepted the position, however, Holley would have found a teaching curriculum that would have suited her certifications. (Id. at 18.)

When Harris spoke with plaintiff, she did not know how long the assignment at Lincoln was going to be, but "thought it could be indefinite because of the mere fact that [B. Gamble] was using sick days." (Harris' Dep. II (ECF No. 43-4) at 21, 30.) Davis told Harris that she would not accept the position at Lincoln because she perceived it as a day-to-day position that would make it difficult to find a caretaker for her mother, whom she cared for. (Id. at 31-32.) Plaintiff's notes provide that on December 5:

> Marlene called again regarding the Lincoln position. Would be until at least February. Had to offer to a business teacher first.....[sic] Advised Marlene that I did not sign up for subbing due [sic] to uncertainty and having to find an aid [sic] willing to come in. Also mentioned I had a contractor coming in next week and it was 2 weeks before Christmas and I had things to do…and did not think anyone would be interested in coming in at this time due [sic] to holidays. Don't want to get into finding someone, canceling them, having to find another person etc. Informed Marlene I was appreciative of her calling me first, that I am interested in working full-time. Then, I can work on getting a permanent sitter for my mother.

(C.S.F. (ECF No. 62) ¶ 217; Pl.'s Dep. (ECF No. 43-2) at 121-22; ECF No. 43-3 at 44.) Plaintiff testified with respect to making arrangements for a caretaker for her mother through the Allegheny County Department of Aging and Community Life on a day-to-day basis, stating: "You can't call today and say I need someone tomorrow. That is why I couldn't do any subbing. It takes time for them to find someone." (Pl.'s Dep. (ECF No. 43-2) at 190-91.) Davis testified that she turned down the position at Lincoln "because it was short notice, basically, No. 1 for turning it down. I was the caregiver for my mother, who was 96 at the time, 95 at the time. But I had not signed up for sub positions." (C.S.F. (ECF No. 62) ¶ 221; Pl.'s Dep. (ECF No. 43-2) at 189.) Harris called Wilson to inform her that Davis had declined the position at Lincoln. (Harris' Dep. II (ECF No. 43-4) at 22-23.) Wilson did not speak with the principal at Lincoln. (Wilson's Dep. (ECF No. 43-7) at 44-45.)

### III.    *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides in relevant part:

**(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

. . .

**(c) Procedures.**

**(1)** *Supporting Factual Positions*.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A

genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing <u>Celotex Corp.</u>, 477 U.S. at 322-23; <u>Anderson</u>, 477 U.S. at 248).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). The court must rely on the substantive law to identify which facts are material. <u>Abington Friends Sch.</u>, 480 F.3d at 256 (citing <u>Anderson</u>, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001); <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### IV. Discussion

### A. Claims Against PPS

### 1. Age discrimination claims – count two (ADEA) and count four (PHRA age discrimination)

In count two of the complaint, plaintiff alleges PPS violated her rights under the ADEA by (1) retaining Banks and changing her job description so that she need not obtain the supervisory certification to remain at the CTE central office; and (2) manipulating Y. Cook's

teaching schedule so that Thompson could do the job when plaintiff was certified to teach Y. Cook's 2007-2008 schedule. (ECF No. 1 ¶¶ 31-33.) Plaintiff makes similar claims under the PHRA for age discrimination. (Id. ¶¶ 42-44.)

### a. General framework

The ADEA prohibits an employer from discriminating against any employee on the basis of the employee's age if the employee is over forty years old, and the PHRA provides likewise.[12] 29 U.S.C. §§ 623(a), 631(a); 43 Pa. Cons. Stat. §§ 954(h), 955(a). In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973), the Supreme Court recognized that it is often difficult to prove that an employer acted with conscious intent to discriminate. One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but was a pretext for unlawful discrimination. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In McDonnell Douglas, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The McDonnell Douglas framework requires a plaintiff to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 254. In so doing, "[t]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Sempier v. Johnson & Higgins, 45 F.3d 724, 728-29 (3d Cir. 1995) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

---

[12] Age discrimination claims under the PHRA are treated the same as ADEA claims and should be collectively treated. Colwell v. Rite Aid Corp., 603 F.3d 495, 500 n.3 (3d Cir. 2010).

The Third Circuit Court of Appeals has held that the burden-shifting framework set forth in McDonnell Douglas applies to claims of discrimination arising under the ADEA. Smith v. Allentown, 589 F.3d 684, 690 (3d Cir. 2009). In Smith, the court described the McDonnell Douglas framework as applied to claims arising under the ADEA as follows:

> Under McDonnell Douglas, the plaintiff bears the burden of proof and the initial burden of production, having to demonstrate a prima facie case of discrimination by showing first, that the plaintiff is forty years of age or older; second, that the defendant took an adverse employment action against the plaintiff; third, that the plaintiff was qualified for the position in question; and fourth, that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir.2004). Once the plaintiff satisfies these elements, the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action. Keller, 130 F.3d at 1108. If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination. Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 n. 4 (3d Cir.1995). At all times, however, the burden of persuasion rests with the plaintiff. Id.

Smith, 589 F.3d at 689-90.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework-with its presumptions and burdens'-disappear[s],…and the sole remaining issue [is] 'discrimination vel non'…." Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (citations omitted). The plaintiff has the burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

The United States Court of Appeals for the Third Circuit has developed the following two-prong test (the "Fuentes test") that a plaintiff must meet to show pretext:

> [T]o defeat summary judgment when the [employer] [articulates] legitimate non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes, 32 F.3d at 764; see Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)."). The two prongs of the Fuentes test are distinct. The court, where appropriate, will analyze both prongs of the Fuentes test to determine whether sufficient evidence was presented by plaintiff to defeat defendant's motion for summary judgment.

Here, there is a dispute with respect to whether there is direct evidence[13] of age discrimination and there is confusion with respect to the effect the direct evidence has on the

_____

[13] In Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004), the Court of Appeals for the Third Circuit described direct evidence as follows:
> To be "direct" for purposes of the *Price Waterhouse* test, evidence must be sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decision. Fakete, 308 F.3d at 338. This means that [the plaintiff] must produce evidence of discriminatory attitudes about age that were causally related to the decision to fire her.

court's analysis. Plaintiff argues there are two instances of direct evidence in the record that warrant the burden of going forward with the evidence to shift to PPS to prove that it would have furloughed plaintiff even if had not considered her age. (ECF No. 52 at 5.) Under the ADEA, however, the burden remains on plaintiff to prove her case, even when she produces direct evidence of discrimination. Gross v. FBL Fin. Serv., 557 U.S. 167, 177-78 n.4 (2009).

In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the Supreme Court held:

> once a "plaintiff in a Title VII case proves that [the plaintiff's membership in a protected class] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [that factor] into account."

Gross, 557 U.S. at 174-75 (quoting Price Waterhouse, 490 U.S. at 258). Stated another way in a Title VII case, "if the defendant initiated an allegedly adverse employment action as the result of both permissible and impermissible motives, the burden of persuasion shifts to the defendant to demonstrate that it would have taken the adverse action notwithstanding the improper motive." Smith, 589 F.3d at 690 (citing Price Waterhouse, 490 U.S. at 244-45). "This burden-shifting framework has become known as the mixed-motive doctrine." Smith, 589 F.3d at 690. Plaintiff argues the court should apply the mixed-motive framework to analyze her ADEA claims.

In Gross, however, the Supreme Court held that the mixed-motive framework available in Title VII discrimination cases is not available in discrimination cases brought under the ADEA. Gross, 557 U.S. at 177. The Court focused on the statutory language of the ADEA, which provides that "[i]t shall be unlawful for an employer" to discriminate against an employee "**because of** such individual's age." 29 U.S.C. § 623(a) (emphasis added) (quoted by Gross, 557

---

…
"[S]tray remarks in the workplace" and "statements by non-decision makers"…would not rise to the level of "direct" for purposes of the *Price Waterhouse* test.

Id. (quoting Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002)).

U.S. at 176). The Court found "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act," and, therefore, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." <u>Gross</u>, 557 U.S. at 177.

> Hence, the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action. A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the " [sic]but-for" cause of the challenged employer decision.

<u>Id.</u> at 177-78. Based upon the foregoing, plaintiff's direct evidence of discrimination may help her to prove the prima facie case of discrimination or that defendants' proffered legitimate reason for its adverse employment action is pretext, but the direct evidence in and of itself does not shift the burden of persuasion to defendants. Plaintiff's ADEA claims against PPS and PFT must be addressed under the <u>McDonnell Douglas</u> framework.

**b. Claim based upon elimination of CTE central office position and Banks' hiring as curriculum coordinator**

In the complaint, plaintiff alleged that PPS discriminated against her when it "retained her colleague, Cherri Banks, at the central office by changing her job description so she did not need to obtain supervisory certification." (ECF No. 1 ¶ 32.) Plaintiff alleges that her job was eliminated while PPS kept Banks at the CTE central office by creating a new job for her, which was essentially the same job plaintiff, Banks, and W. Cook were doing as staff specialists before the positions were eliminated. (<u>Id.</u>) Banks is an African American female and was fifty-five or fifty-six when the alleged age discrimination against plaintiff occurred. (Dobies-Sinicki's Decl. (ECF No. 43-6) ¶ 7.)

To establish a prima facie case under the ADEA when the employer reduces its force, e.g., eliminates the plaintiff's position, the plaintiff must show: 1) she is age forty or older; 2)

defendant took an adverse employment action against her; 3) plaintiff was qualified for the position in question; and 4) the employer retained by a sufficiently younger person or a younger, similarly situated employee. Anderson v. Consol. Rail Corp., 297 F.3d 242, 249-50 (3d Cir. 2002) ("Because ADEA is not a bumping statute,…the plaintiffs must show that the employer retained a similarly situated employee. Were we to hold otherwise, we would be construing ADEA as guaranteeing a protected employee a job at the expense of a sufficiently younger employee.").

Here, it is not disputed that plaintiff was sixty-five years old when the alleged age discrimination occurred. PPS acted adversely against her when it eliminated her position as teacher on special assignment and did not create a position for her like it did for Banks. Banks was fifty-five or fifty-six when the alleged discrimination occurred. Banks being sufficiently younger than plaintiff to establish a prima facie case is not an issue. (ECF No. 46 at 6-7 n.3.)

PPS argues, among other things, that plaintiff cannot prove her prima facie case because she was not similarly situated to Banks. (ECF No. 46 at 7.) The court agrees with PPS. "'Similarly situated' means similar 'in all relevant respects.'" Martinez v. Int'l Bhd. of Elec. Workers, 352 F. App'x 737, 741 (3d Cir. 2009) (quoting Kline v. Kansas City, Mo., Fire Dep't, 175 F.3d 660, 670-71 (8th Cir. 1999)). Plaintiff and Banks did not have the same qualifications, did not share the same status as employees, did not have the same certifications, were paid on different pay scales, and worked different durations during the year. While Banks has, among other credentials, her doctorate degree, superintendent and assistant superintendent letters of eligibility, and an administrative II certificate in secondary principal, plaintiff has a master's degree and did not possess any superintendent certifications. Banks was paid on the Support Administrators Salary Plan as a staff specialist for the CTE central office. Plaintiff, on the other

hand, served as a teacher on special assignment as a staff specialist for the CTE central office and was paid as a teacher. Banks worked throughout the summer months. Plaintiff had a ten-month contract with PPS, meaning she worked during the academic year, which amounted to 192 days per year. Under those circumstances, the court cannot find Banks is similarly situated to plaintiff for the purpose of establishing a prima facie case for age discrimination. The motion for summary judgment filed by PPS will, therefore, be granted with respect to plaintiff's ADEA claim based upon PPS eliminating her position as staff specialist and its subsequent treatment of Banks.[14]

### c. Claim based upon PPS' failure to place plaintiff at Carrick

PPS assumes for the sake of argument that plaintiff can establish the prima facie case for age discrimination based upon PPS not placing her at Carrick. (ECF No. 46 at 12.) PPS argues that it offered a legitimate nondiscriminatory reason for not placing plaintiff at Carrick and that plaintiff failed to meet her burden by a preponderance of the evidence that the legitimate reason offered by PPS is pretext for discrimination. (Id.) As discussed supra, the burden on a defendant to set forth its legitimate nondiscriminatory reason for its actions is "relatively light," and can be satisfied "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for [plaintiff's termination]...." Fuentes, 32 F.3d at 763 (emphasis added) (citations omitted). PPS argues its legitimate reason for not placing plaintiff in the teaching position at Carrick is that plaintiff was not certified to teach a full schedule of classes at Carrick for the 2008-2009 school year. (ECF No. 46 at 13.) There is ample evidence of

---

[14] Harris provided Banks with information with respect to obtaining an emergency permit and additional information with respect to the vocational supervisory or vocational director certificate that she did not provide to plaintiff. This conduct does not provide a viable basis for a discrimination claim against PPS, however, because plaintiff and Banks are not similarly situated as discussed supra.

record that the school district was concerned with the upcoming 339 audit and the certification issues raised by Chapter 339. For example, Stewart was hired for the purpose of preparing the district for the upcoming 339 audit. The court concludes PPS satisfied its burden to set forth a legitimate nondiscriminatory reason for not placing plaintiff at Carrick. In turn, plaintiff must carry the burden of proving by a preponderance of the evidence that the legitimate reason offered by PPS was not its true reason, but was a pretext for discrimination. Jones, 198 F.3d at 410. The court will determine whether plaintiff met this burden to show a reasonable jury could find based upon the evidence of record that PPS' reasoning for not placing plaintiff at Carrick was pretext for discrimination under the two-prong test set forth by the Third Circuit Court of Appeals in Fuentes.

### i. Prong one of **Fuentes** test

Prong one of the Fuentes test focuses on whether a plaintiff submitted evidence from which a fact-finder could reasonably disbelieve a defendant's articulated legitimate reasons for the plaintiff's termination. Under this prong, the plaintiff must point to:

> such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," Ezold, 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Fuentes, 32 F.3d at 765. The district court under this prong must focus on the legitimate, non-discriminatory reason offered by the employer. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (A "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon . . . ."). The court is neither permitted to get involved in

the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Id. at 527.

The question in prong one of the Fuentes test "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)). Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it. Wildi v. Alle-Kiski Medical Center, 659 F.Supp.2d 640, 670 (W.D. Pa. 2009).

> It is not the function of this court to determine whether defendants' business judgment in terminating plaintiff was correct. In Watson v. Southeastern Pennsylvania Transportation Authority, 207 F.3d 207 (3d Cir.2000), the Court of Appeals for the Third Circuit explained that an employer is permitted "to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct." Id. at 222.
> …
> The inquiry must focus upon "the perception of the decision maker." Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir.1991). The defendants only needed an honest belief that the incidents occurred. Watson, 207 F.3d at 222.

Id. Here, whether PPS' view that plaintiff was not entitled to the position at Carrick because she did not possess required certifications was correct, is not determinative; rather, the inquiry must focus upon whether that view was the reason plaintiff was not placed at Carrick or whether the *actual reason* she was not placed was her age.

Plaintiff argues that PPS is using the certification requirements as pretext for not placing her at Carrick based upon her age. (ECF No. 52 at 9.) Plaintiff argues that she was entitled to the position at Carrick, which was given to Thompson, who is "much younger" than plaintiff. (ECF No. 52 at 13.) Plaintiff believes that with adjustments to the schedule, she could have taught a

full schedule of classes at Carrick in the 2008-2009 school year. (Pl.'s Aff. (ECF No. 51-1) ¶¶ 13-19.)

Plaintiff argues that "there are inconsistencies in and fabrications surrounding the School District's proffered justifications for its actions precluding the entry of summary judgment." (ECF No. 52 at 9.) Plaintiff argues she and Y. Cook "were essentially able to teach the same subjects," but Harris's "dim, but unjustified view of the scope of [plaintiff's] certifications" caused her to give the position at Carrick to Thompson and not plaintiff. (Id. at 12-13.)

As evidence of pretext, plaintiff argues that she was certified to fill the position at Carrick, but the schedule was manipulated to provide a schedule fit for Thompson, a much younger Caucasian male. (ECF No. 52 at 12-16.) Plaintiff's argument is based upon two main assertions: (1) she was entitled and certified to teach Y. Cook's 2007-2008 schedule; and (2) the Business Academy teachers would have changed their schedules to accommodate plaintiff's certifications. (Id.)

First, plaintiff argues that the state certification requirements cannot be the real reason for her furlough because she was certified to teach Y. Cook's 2007-2008 schedule of classes. (ECF No. 52 at 12.) Plaintiff's argument, however, presupposes that PPS had an obligation to freeze Y. Cook's schedule at the end of the 2007-2008 school year for plaintiff to fill the following school year and that she was certified to teach the courses in that schedule. Freezing Y. Cook's schedule for plaintiff would have disregarded the course selection process, which includes consideration of student preference, and was described by the Carrick Business Academy teachers and accounted for in the collective bargaining agreement. Plaintiff did not point to any evidence of record indicating PPS had an obligation to preserve Y. Cook's 2007-2008 schedule and to disregard the course selection process in order to do so.

PPS argues that even if Y. Cook's schedule was frozen in time, plaintiff was not certified to teach Y. Cook's schedule from the 2007-2008 school year. (ECF No. 46 at 13.) During that school year, Y. Cook was an ITL and taught Intro to Entrepreneurship and Integrated Business Procedures. PPS argues plaintiff was not certified to teach Integrated Business Procedures. Y. Cook testified that the course was an advanced course and she described it entirely in reference to "software packages," including Excel, Access, and PowerPoint. Y. Cook testified that her typewriting certification allowed her to teach Integrated Business Procedures. Plaintiff did not possess a typewriting certification. Turner testified a business certification would be necessary to teach Integrated Business Procedures and that a marketing (distributive) education certificate was not a business certificate. Turner testified that she would need to look into the issue further in order to give a conclusive answer with respect to the certifications needed to teach the course.

Despite Y. Cook having taught the course and her assertion that her typewriting certificate, as opposed to her distributive (marketing) certificate, certified her to teach the course, plaintiff argues based upon the course description in the PPS course catalogue, that her marketing (distributive) education certification certified her to teach Integrated Business Procedures. (Pl.'s Aff. (ECF No. 51-1) ¶ 18.) Plaintiff did not address Turner's statement that "on the surface" a business information technology certificate or at least an accounting certificate is required to teach Integrated Business Procedures or point to a CSPG or CIP which indicates that her certifications permitted her to teach the course. In light of the lack of evidence that PPS had an obligation to or was able to preserve Y. Cook's 2007-2008 schedule and the evidence presented by Turner's and Y. Cook's testimony with respect to the Integrated Business Procedures class, plaintiff failed to adduce sufficient evidence that the reasoning of PPS with respect to plaintiff not being certified to teach the Integrated Business Procedures course was so

implausible that "a reasonable factfinder could rationally find [it] 'unworthy of credence' and hence infer that the proffered nondiscriminatory reason 'did not actually motivate' the employer's action." Simpson, 142 F.3d at 644 (quoting Ezold, 983 F.2d at 531).

Plaintiff next argues that even if Y. Cook's schedule was not frozen in time, the Business Academy teachers at Carrick would have rearranged their schedules to create a schedule of classes that she was certified to teach. (Pl.'s Aff. (ECF No. 51-1) ¶ 14.) Plaintiff's argument amounts to stating her belief, but she did not point to evidence of record that those teachers in fact would have accommodated their schedules. Most telling there is no evidence that Harris, who plaintiff asserts made the decisions with respect to the Carrick position, knew that the teachers at Carrick would make changes in their schedules to accommodate plaintiff's certifications. Plaintiff having this knowledge or belief is not relevant under Fuentes because the relevant inquiry is the state of mind of the decision maker and not the employee. Wildi, 659 F.Supp.2d at 670. Second, per the collective bargaining agreement, teachers were to be placed by certification and seniority. The need for the Business Academy teachers to make accommodations in the schedule with respect to plaintiff's certifications would have only arisen if Harris placed plaintiff into a position associated with a schedule that she was not certified to teach. Had Harris done this, she may have violated the collective bargaining agreement because plaintiff would have been placed in a position associated with a schedule she was not certified to teach. This kind of action would have been in direct contradiction to PPS' stated concerns with respect to certification issues.

Plaintiff's argument with respect to accommodations made by the Business Academy teachers rests in large part upon the schedule changes made with respect to Thompson. There is no evidence, however, that Thompson was placed into a position associated with a schedule that

he was not certified to teach. Whether he was overwhelmed with respect to his placement because he had not taught the classes before is a different issue than whether he was certified to teach the classes in the first instance. Thompson was certified to teach either McManus' or his schedule during the 2008-2009 school year while plaintiff lacked certification to teach Thompson's entire schedule and at the very least, the Microsoft Office 1 course taught by McManus during that same year.

With respect to the Business Foundations classes taught by McManus during the 2008-2009 school year, plaintiff argued she could have taught those classes as well. When presented with the PPS business curriculum that included the Business Foundations course and asked which courses a person with a marketing (distributive) education certification could teach, Turner's answer did not include Business Foundations. Plaintiff argued she was certified to teach Business Foundations because it is a general business course and she is certified to teach general business courses. (Pl.'s Aff. (ECF No. 51-1) ¶ 19.) Turner testified, however, that the marketing (distributive) education certificate usually would not allow a person to teach a general business course and she would need to conduct a further investigation to provide a conclusive answer.

Plaintiff argued that the 2004 CSPG No. 49 references CSPG No. 33, which certifies teachers with business marketing certifications to teach general business courses. (ECF No. 52 at 13-14.) Turner clarified, however, that the 2004 CSPG No. 49 and the 2010 CSPG No. 49, which does not provide the same reference to CSPG No. 33, provide the same scope of coverage, and the business marketing certificate is separate and distinct from plaintiff's marketing (distributive) education certificate. Under those circumstances, plaintiff did not adduce sufficient evidence of record to show that the reasoning of PPS with respect to the Business Foundations course was so implausible that "a reasonable factfinder could rationally find [it] 'unworthy of credence' and

hence infer that the proffered nondiscriminatory reason 'did not actually motivate' the employer's action." Simpson, 142 F.3d at 644 (quoting Ezold, 983 F.2d at 531).

Plaintiff pointed to the change in schedule with respect to the Intro to Entrepreneurship classes as evidence of pretext by PPS. (ECF No. 52 at 14-16.) PPS' actions in this regard, however, are not inconsistent with its stated reasoning for not placing plaintiff at Carrick. Plaintiff argued that Thompson's placement at Carrick "created a significant problem" and offered as evidence of that problem Hoelzle's email written the day after Thompson learned about his placement at Carrick. (Id. at 15.) Hoelzle wrote that the principal gave the other teachers Y. Cook's classes and let Thompson teach computer courses, and that Thompson felt overwhelmed by the placement. As stated previously, however, whether Thompson was overwhelmed with respect to his placement because he had not taught the classes before is a different issue than whether he was certified to teach the classes in the first instance. The principal rearranging the schedule in order to provide Thompson a schedule he was comfortable with is not inconsistent with a desire to ensure teachers are properly certified. Thompson was certified to teach both Y. Cook's 2007-2008 schedule and the schedule he taught in the 2008-2009 school year. Any problem created by Thompson's placement does not negate him being certified to hold the position to which he was assigned. Plaintiff's argument with respect to the Intro to Entrepreneurship classes is, therefore, not sufficient to render PPS' legitimate reason implausible for the purpose of PPS' motion for summary judgment.

Plaintiff pointed to a telephone call between Harris and Kowalski on August 27, 2008 as further evidence of Harris' "scheme" to place Thompson in a position over her. (ECF No. 52 at 15.) Plaintiff argued:

> Harris first searched for alternatives to placing Thompson at Carrick. Her scheme
> was to put Thompson in a slot where he would be teaching keyboarding and

computer classes. She asked Beverly Kowalski, who taught at Westinghouse, to go to Carrick, so that Thompson could take over the schedule Harris thought Kowalski was teaching.

(ECF No. 52 at 15.) Plaintiff explained that when Harris learned Kowalski was teaching accounting, she discontinued the telephone call. Plaintiff argued the telephone call between Kowalski and Harris, which took place the day after Thompson was offered the position, is evidence of Harris' attempts to manipulate the situation to find a position suitable for Thompson. (Id.) Plaintiff does not acknowledge, however, that even if Harris tried to find Thompson a position teaching keyboarding and computer classes like he had at Rogers, he was still certified to teach Y. Cook's 2007-2008 schedule and McManus' and his 2008-2009 schedules.

Plaintiff relies in large part on a conversation with Harris to prove pretext and support her claim for age discrimination. During a conversation in which plaintiff was trying to convince Harris that she should have been placed at Carrick before Thompson, Harris explained that plaintiff was not placed at Carrick because her certification was "too old." Plaintiff interpreted this statement as meaning Harris thought plaintiff was "too old." (ECF No. 52 at 4.) PPS argues that Harris' statement was made in reference to plaintiff's certifications and not her age, and, therefore, are not "direct comments indicative of ageism." (ECF No. 61 at 8-9.) The issue before the court is whether Harris' statement makes PPS' stated reason for furloughing plaintiff, i.e., she was not certified to teach the schedule associated with the position at Carrick, so implausible "that a reasonable factfinder could rationally find [it] "unworthy of credence," Fuentes, 32 F.3d at 765 (citing Ezold, 983 F.2d at 531).

Based upon the evidence of record, Harris' statement that plaintiff's certification was "too old" is not sufficient for a finding that a reasonable jury would conclude PPS' stated reason for plaintiff's furlough is so implausible that it is unworthy of credence and that plaintiff's age

was the but-for reason of her furlough. It may be inferred that Harris' statement with respect to plaintiff's certification meant that Harris thought plaintiff was too old for two reasons: (1) the statement was inaccurate because plaintiff's teaching certifications were good for ninety-nine years; and (2) the age of a certificate necessarily corresponds with the age of a person.[15] Despite any discriminatory animus on the part of Harris, however, plaintiff failed to produce evidence of record sufficient for a finding that she was certified to teach a schedule of classes at Carrick for the 2008-2009 school year. Under those circumstances, the court must conclude that plaintiff failed to set forth sufficient evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in PPS' stated reason for not placing plaintiff at Carrick, i.e., she was not certified to teach a full schedule of classes at Carrick, "[such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. Simpson, 142 F.3d at 644 (quoting Ezold, 983 F.2d at 531).

### ii. Prong two of Fuentes test

The court is next required to examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. This prong permits the plaintiff to

---

[15] On the other hand, a nondiscriminatory explanation exists for Harris' statement that plaintiff's certifications were "too old." There is evidence that certifications issued more recently are broader in scope than certifications that were issued at earlier dates. For example, certificates in accounting, secretarial, business marketing, office technology, and data processing were previously issued separately, meaning if a person wished to be certified in those five areas, they would need to obtain five different certifications. More recently, a person may obtain a certification under CSPG No. 33, Business Computer Information Technology, to become certified in those five areas. It follows that CSPG No. 33 is broader in scope than the individual certifications issued in previous years. The broader a certificate, the more classes a teacher may be certified to teach under that certificate. The comment made by Harris, therefore, may be attributed to plaintiff's marketing (distributive) education certificate being limited in scope because unlike the more recently issued CSPG No. 33, it covers less topic areas. Viewed in that light, the comment that plaintiff's certification was "too old" is not evidence of Harris' discriminatory animus against plaintiff.

survive summary judgment if she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762. The kinds of evidence relied upon by the court of appeals under this prong of the Fuentes analysis are: 1) whether the employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer has treated more favorably similarly situated persons not within the protected class. Simpson, 142 F.3d at 644-45 (3d Cir. 1998). The court will examine whether plaintiff submitted that kind of evidence.

With respect to the first consideration, i.e., whether the employer previously discriminated against the plaintiff, there is no evidence of record that prior to the incidents giving rise to the current law suit that PPS previously discriminated against plaintiff.

With respect to the second consideration, i.e., whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, there is no evidence of record that prior to the incidents giving rise to the current law suit that PPS previously discriminated against other persons within plaintiff's protected class or within another protected class.

With respect to the third consideration, i.e., whether the employer has treated more favorably similarly situated persons not within the protected class, there is no evidence of record that prior to the incidents giving rise to the current law suit that PPS previously differently treated someone outside of plaintiff's protected class with plaintiff's certifications.

Plaintiff failed to present evidence under the second prong of Fuentes that discrimination based upon age was more likely than not the cause of her furlough. Because the record shows

plaintiff cannot satisfy her burden to prove that PPS' legitimate reason is pretext for discrimination based upon plaintiff's age, summary judgment will be granted in PPS' favor with respect to the age discrimination claims in counts two and four.

### d. Claims based upon PPS' failure to place plaintiff at Allderdice[16]

It is unclear whether plaintiff's claims of age discrimination against PPS are based upon whether she was entitled to Ralston's position at Allderdice. Plaintiff's only reference to the Allderdice position in the complaint is:

> There was also a younger teacher teaching Marketing at Allderdice H.S. When Davis asked the PFT representative about that position she informed Davis that the state code was different. Davis tried to explain that the codes were being changed but the courses were the same and Davis was certified to teach the courses.

(ECF No. 1 ¶ 33.) Assuming for the sake of argument that plaintiff's claims of age discrimination are also based upon her entitlement to Ralston's position at Allderdice, plaintiff failed to adduce sufficient evidence for a reasonable jury to find that PPS' reasons for not placing her in that position, i.e., she was not certified for Ralston's position, are pretext for discrimination under either prong of Fuentes.

### i. Prong one of Fuentes test

Prong one of the Fuentes test focuses on whether a plaintiff submitted evidence from which a fact-finder could reasonably disbelieve a defendant's articulated legitimate reasons for the plaintiff's termination. Plaintiff failed to meet this burden. Ralston taught the following classes in the 2007-2008 school year: Sales Merchandising, Marketing Education, Marketing Lab, and Web Design. Plaintiff asserts Ralston taught the same schedule in the 2008-2009 school

---

[16] Plaintiff does not allege race or gender discrimination against defendants based upon her not being placed at Allderdice. Plaintiff's claim with respect to the Allderdice position, if there is one at all, appears to be an age discrimination claim. There is no dispute that Ralston was younger than plaintiff. (Pl.'s Aff. (ECF No. 51-1) ¶ 20.)

year. There is no dispute that plaintiff was not certified to teach Ralston's Web Design course. (See Pl.'s Dep. (ECF No. 43-2) at 100.) It is, therefore, undisputed that plaintiff was not certified to teach the schedule associated with Ralston's position.

Plaintiff argues, however, that when her position was eliminated at the CTE central office, the Allderdice schedule should have been redone to provide her with a schedule that she was certified to teach. (Pl.'s Aff. (ECF No. 51-1) ¶ 21.) To accomplish this task, PPS needed to place plaintiff in a position she was not certified to teach, i.e., the position associated with Ralston's schedule, and then expect the employees at Allderdice to rearrange the schedule to accommodate plaintiff. First, there is no evidence that it was possible to rearrange the classes based upon the teachers' certifications to create a schedule fit for plaintiff's certifications because there is no evidence of record with respect to what the other Allderdice teacher's certifications were. Second, as discussed above, the collective bargaining agreement provides that teachers are to be placed by certification and seniority. Plaintiff was not certified to teach Ralston's schedule. Allowing her to bump Ralston, therefore, would be contrary to the collective bargaining agreement and PPS' asserted nondiscriminatory reason for furloughing plaintiff. Although Ralston had less seniority than plaintiff, Ralston was certified to teach Web Design, while plaintiff was not certified to teach that course. Under those circumstances, the court finds plaintiff failed to adduce sufficient evidence that PPS' stated reason for not placing her at Allderdice is so implausible or filled with inconsistencies that a reasonable fact-finder could reasonably disbelieve PPS' articulated legitimate reasons for the plaintiff's furlough, i.e., she was not certified to teach Ralston's schedule of classes.

**ii. Prong two of <u>Fuentes</u> test**

Here, the court's analysis of prong two of <u>Fuentes</u> with respect to plaintiff not being placed at Allderdice is the same as the analysis with respect to not being placed at Carrick. Plaintiff did not point to evidence of record that would prove it was more likely than not discrimination was a motivating or determinative cause of her furlough based upon PPS' past practices or favorable treatment of a similarly situated person outside her protected class. The court will, therefore, grant PPS' motion for summary judgment with respect to plaintiff's age discrimination claims based upon her alleged entitlement to the position at Allderdice.

**2.   *Race and gender discrimination claims – counts one (Title VII), three (§§ 1981 and 1983), and four (PHRA race and gender claims)* [17]**

In count one of the complaint, plaintiff alleges PPS violated her rights under Title VII by discriminating against her on the basis of her race and gender by giving Thompson, a Caucasian male, the teaching position at Carrick. Plaintiff argues she was entitled to the position based upon seniority and her certifications. (ECF No. 1 ¶¶ 27-30.) In count three of the complaint, plaintiff alleges PPS violated her rights to equal protection of the laws under 42 U.S.C. §§ 1981 and 1983 based upon her race by giving the open position at Carrick to Thompson. (<u>Id.</u> at ¶¶ 36-41.) PFT is named in the heading of count three, but there are no allegations made with respect to PFT under § 1981 or § 1983. (<u>Id.</u>) In count four, plaintiff raises claims under the PHRA for race and gender discrimination. (<u>Id.</u> at ¶¶ 42-44.)

---

[17] Plaintiff does not contest defendants' motions for summary judgment with respect to her claims raised under Title VII or the PHRA for race or gender discrimination. The court, however, cannot grant summary judgment in favor of defendants solely because plaintiff failed to object to their motions with respect to those claims. Defendants are entitled to judgment as a matter of law only if the evidence of record supports such a finding. <u>Anchorage Assocs. V. Virgin Islands Bd. of Tax Review</u>, 922 F.2d 168, 175 (3d Cir. 1990) ("Even though Rule 56(e) requires a non-moving party to 'set forth specific facts showing that there is a genuine issue for trial', it is 'well-settled ... that this does not mean that a moving party is automatically entitled to summary judgment if the opposing party does not respond.'").

Plaintiff's race and gender discrimination claims under Title VII, § 1981, § 1983, and the PHRA are analyzed together for summary judgment purposes. Jones, 198 F.3d at 410; Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir.1997); see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) (assuming Title VII burden-shifting framework applies to a claim brought under § 1983). Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment. Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315 (3d Cir. 2008) (citing Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 224 n.4 (3d Cir. 2000)). Since 1972, Title VII has required that personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex or national origin." 42 U.S.C. § 2000e-16(a). Courts apply the McDonnell Douglas burden-shifting framework discussed previously to analyze disparate treatment claims under Title VII.

Similar to discrimination claims under the ADEA, the McDonnell Douglas framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination. To state a claim for race or gender discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she suffered an adverse employment decision; and (4) the decision was made under circumstances giving rise to an inference that the adverse action was taken on account of plaintiff's membership in the protected class. Makky, 541 F.3d at 214.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Id. The burden on the defendant

at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763.

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework-with its presumptions and burdens'-disappear[s],…and the sole remaining issue [is] 'discrimination vel non'…." Reeves, 530 U.S. at 142-43 (citations omitted). The plaintiff has the burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones, 198 F.3d at 410.

Here, PPS assumed for the sake of argument that plaintiff can establish a prima facie case for gender and race discrimination. (ECF No. 46 at 12.) PPS argued that it has a legitimate nondiscriminatory reason for the challenged conduct at issue and plaintiff failed to show there is a genuine issue with respect to the legitimate reason offered by PPS being pretext for discrimination. (Id.) As discussed previously, PPS argued its legitimate reason for not placing plaintiff in the teaching position at Carrick is that plaintiff was not certified to teach a full schedule of classes at Carrick for the 2008-2009 school year. (ECF No. 46 at 12-13.) The court finds PPS' stated reason for not placing plaintiff in a teaching position at Carrick satisfies its burden, which is "relatively light" to set forth a nondiscriminatory reason. In turn, plaintiff has the burden of producing evidence that PPS' reliance on the state certification requirements, i.e., she was not certified to teach a full schedule at Carrick, are pretext for discriminating against plaintiff based upon her race or gender. Whether sufficient evidence of pretext was presented by plaintiff with respect to her claims of race and gender discrimination to defeat PPS' motion for summary judgment is examined under the two prongs of the Fuentes test.

Prong one of the <u>Fuentes</u> test focuses on whether a plaintiff submitted evidence from which a fact-finder could reasonably disbelieve a defendant's articulated legitimate reason for the plaintiff's termination. For the same reasons plaintiff failed to meet this burden with respect to her age discrimination claims based upon not being placed at Carrick,[18] plaintiff failed to meet this burden with respect to her race and gender claims.

Prong two of the <u>Fuentes</u> test permits the plaintiff to survive summary judgment if she can demonstrate through evidence of record that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." <u>Fuentes</u>, 32 F.3d at 762. As stated above, plaintiff did not adduce any evidence of record with respect to a history of PPS discriminating against plaintiff or persons within her protected class or treating more favorably similarly situated persons not in plaintiff's protected class. Plaintiff failed to satisfy either prong of <u>Fuentes</u> with respect to her claims for race and gender discrimination. Summary judgment will, therefore, be granted in PPS' favor with respect to plaintiff's claims of race or gender discrimination set forth in counts one, three and four of the complaint.[19]

### B. Claims against PFT

In counts two, three, and four, plaintiff argues PFT condoned the discriminatory actions of PPS by refusing to file a grievance on plaintiff's behalf with respect to plaintiffs' furlough. (ECF No. 1.) While PFT cannot be held liable for discriminatory action taken by PPS, PFT can

---

[18] Plaintiff's assertion of pretext under prong one of <u>Fuentes</u> is weaker with respect to her race and gender claims than it is with respect to her age discrimination claims. With respect to plaintiff's claims of age discrimination, she relies on evidence of Harris telling her that her certifications were "too old" to prove pretext. In contrast, plaintiff does not argue that Harris telling her that her certifications were "too old" supports a finding of pretext based upon race or gender discrimination. Even with the additional evidence presented in the age discrimination claims, plaintiff failed to adduce evidence sufficient for a reasonable jury to find pretext.

[19] PFT is named in the heading of count three, but there are no allegations made with respect to PFT under § 1981 or § 1983. (ECF No. 1 ¶¶ 36-41.)

be held liable for its *own* discriminatory acts. <u>Hubbell v. World Kitchen, LLC</u>, 717 F.Supp.2d 494, 504 (W.D. Pa. 2012). To establish a prima facie case of discrimination against PFT, plaintiff must show: (1) PPS discriminated against her in a manner which constituted a violation of the collective bargaining agreement; (2) she affirmatively requested union intervention to redress the discrimination; and (3) PFT deliberately ignored her request. <u>Id.</u> (<u>citing</u> <u>Slater v. Susquehanna Cnty.</u>, 613 F.Supp.2d 653, 664 (M.D. Pa. 2009)).

PFT is named in the heading of count three, but there are no allegations made with respect to PFT under § 1981 or § 1983. (ECF No. 1 at 9-10.) On that basis, the claims against PFT in count three must be dismissed. With respect to counts two and four, based upon the evidence of record, plaintiff cannot establish the first element of the prima facie case of discrimination against PFT, i.e., PPS discriminated against her under the ADEA or the PHRA in a manner which constituted a violation of the collective bargaining. Plaintiff did not identify a provision of the collective bargaining that was violated by PPS not placing her at Carrick or Allderdice. There is no dispute that Davis, Thompson, and Ralston were to be placed in teaching positions according to certification and seniority. To the extent the collective bargaining agreement provides that teachers should be placed by certification and seniority, plaintiff did not point to evidence of record sufficient for a reasonable jury to find she was certified to teach the schedules relevant to the positions at Carrick or Allderdice. It follows that plaintiff failed to adduce sufficient evidence to show that PPS discriminated against her under the ADEA or the PHRA in a manner which constituted a violation of the collective bargaining agreement. PFT's motion for summary judgment will, therefore, be granted with respect to plaintiff's claims asserted against PFT in counts two, three, and four.

V.    *Conclusion*

With respect to her ADEA claim based upon the elimination of her position from the CTE central office, plaintiff failed to adduce evidence of a similarly situated employee who received more favorable treatment, and with respect to all her claims, she failed to adduce sufficient evidence of pretext for a reasonable jury to render a verdict in her favor. Under those circumstances and for the reasons set forth in this memorandum opinion, PPS' and PFT's motions for summary judgment (ECF Nos. 41, 44) will be GRANTED, and an appropriate order will be entered.

Dated: March 13, 2013                                    By the court,

                                                         /s/ Joy Flowers Conti
                                                         Joy Flowers Conti
                                                         United States District Judge